IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA

VS.                    CASE NO. 4:15cr00142-01 JM

JAVIER LEON

MOTION TO SUPPRESS PHYSICAL EVIDENCE
AND MEMORANDUM IN SUPPORT

This case arises from a stop and search of the Defendant's eighteen-wheeler truck. Such detention violated Leon's constitutional right to be free from unreasonable searches and seizures under the Fourth Amendment. Such search was made without freely given voluntary consent and with the absence of any such extrinsic circumstances as to give probable cause to justify it. The subject of this motion is the alleged contraband that was recovered pursuant to the unlawful seizure and search of that truck.

## I. Introduction

On March 30, 2016, members of the Arkansas State Police illegally detained the Defendant and conducted an unlawful search and seizure of his eighteen-wheeler truck. On that date, Olen Craig of the Arkansas State Police "observed a tractor trailer parked on the shoulder of the entrance ramp from Kerr Road" to Interstate-40 East, in Lonoke County, Arkansas. *See Attached Exhibit A Affidavit for Warrant of Arrest*, at 1. Craig pulled over into the shoulder just in front of the

1

rig. *Exhibit A*, at 1. According to Craig's initial report, he contacted the driver of the truck "on a motorist assist." *See Attached Exhibit B Lonoke County Arrest / Disposition Report*. Craig saw that the driver was sitting at the wheel, and then "stepped onto [the driver's] doorstep to see what the trouble was." *Exhibit A*, at 1.

The driver of the truck was the Defendant, Javier Leon. Leon told Craig he knew he was not supposed to stop on the shoulder, but only did so to talk to his dispatcher. *Exhibit A*, at 1. Craig asked if Leon was having an emergency, and Leon responded that he was not. *Exhibit A*, at 1. When Craig asked Leon what he was hauling, Leon "indicated he had 20 drops of furniture" and "told [Craig] that he owned the furniture store where he loaded." *Exhibit A*, at 1.

After inspecting Leon's bill of lading, Craig asked Leon if there was anything illegal in the truck, to which Leon replied that there was not. *Exhibit A*, at 1. Craig noted his belief that Leon was uncomfortable about the question. *Exhibit A*, at 1. Craig then asked about the presence of particular drugs by name, and Leon denied their presence one by one by shaking his head and saying "no" several times. *Exhibit A*, at 1. Craig "felt the response was an over reaction to the normal and perceived it as nervousness on his part." *Exhibit A*, at 1.

Craig then "asked for permission to search the vehicle and [Leon] granted it." *Exhibit A*, at 1. Craig "told him that he had the right to tell me no and asked if it was still okay for me to search his vehicle. He again said it was okay." *Exhibit A*,

at 1. Craig then asked Leon to remove a padlock from the rear door to the trailer and open one door, which he did. *Exhibit A*, at 1. Craig "observed that the trailer appeared to be fully loaded with furniture as [Leon] had said." *Exhibit A*, at 1-2.

Despite everything checking out, Craig "decided to get a canine to the scene and contacted Trooper Chase Melder." *Exhibit A*, at 2. Craig noted in his initial arrest report that during his Craig did not ask Leon for consent to conduct a dog sniff. Melder arrived on scene and deployed K-9 Pavatt. *Exhibit A*, at 2. According to Melder, K-9 Pavatt exhibit the same changes in behavior Melder had seen before when Pavatt smelled narcotics while sniffing under the trailer near the rear tires. *See Attached Exhibit C Arkansas State Police K-9 Search/Find Log*. Melder "crawled [under] the load of the trailer" and discovered suspected methamphetamine. *See Exhibit C*.

II.

It is unclear how much time elapsed between Craig's "decision to get a canine to the scene" and when Melder conducted the dog sniff. According to Craig's initial arrest report, Leon was arrested at "15:30," or 3:30pm. *See Exhibit B*. However, according to the timestamp from the dash-camera video recording provided to defense counsel by the Lonoke County Prosecuting Attorney, Melder began conducting the dog sniff around the truck at "16:09," or 4:09pm, 39 minutes *after* Leon was arrested. Melder's K-9 Search/Find Log also lists 4:09pm as the

time of the dog sniff. *See Exhibit C.* This information is irreconcilable with Craig's notation in his sworn affidavit that he handcuffed Leon and placed him in the backseat of his patrol cruiser *after* Melder's discovery of the alleged contraband. *Exhibit A*, at 1.

The footage from the one dash-camera video provided to defense counsel shows four officers standing behind the truck for about 90 seconds before Melder begins the sniff. Before Melder begins, Craig walks back toward his cruiser in front of the truck. The video does not show Defendant present at the scene while the sniff was conducted. The video cuts off after Melder and K-9 Pavatt conducted a sniff of the truck's trailer. There is no video of the resulting search of the trailer, or of Leon's arrest, or indeed of Leon's person on the scene at all.

It is also unclear where the alleged contraband was found specifically. According to Craig, it "was located about a third of the way inside of the trailer comingled with the legitimate load of cargo." *Exhibit A*, at 2. However, according to Melder, he "crawled the load of the trailer and discovered" the alleged contraband "above where Pavatt alerted on the trailer." *Exhibit C*. There is no video of the discovery of the alleged contraband from within the trailer following the dog sniff.

**III. <u>Law Enforcement Unconstitutionally Prolonged the Encounter With Leon to Conduct a Canine Sniff of His Truck Absent Reasonable Suspicion of Criminal Activity</u>**

### A. Law Enforcement's Initial Encounter With Leon Ripened Into an Seizure Under the Fourth Amendment.

As stated previously, Craig noted that the initial purpose of his encounter with Leon was a "motorist assist." This Court's analysis begins with determining into which one of the three categories of police-citizen encounters this encounter falls. *See United States v. Poitier*, 818 F.2d 679, 681-82 (8th Cir. 1987), *cert. denied*, 484 U.S. 1006 (1988). The Eighth Circuit Court of Appeals has noted,

> Supreme Court jurisprudence has placed police-citizen encounters into three tiers or categories: First, there are communications between officers and citizens that are consensual and involve no coercion or restraint of liberty. Such encounters are outside the scope of the Fourth Amendment. Second, there are the so-called *Terry*-type stops. These are brief, minimally intrusive seizures but which are considered significant enough to invoke Fourth Amendment safeguards and thus must be supported by a reasonable suspicion of criminal activity. Third, there are highly intrusive, full-scale arrests, which must be based on probable cause.

*Id.* at 682.

Not every encounter between a police officer and a citizen constitutes an unreasonable seizure under the Fourth Amendment:

> Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.

*Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent

5

arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (quoting *United States v. Martinez-Fuente*, 428 U.S. 543, 554 (1976)).

In order to determine whether a particular encounter constitutes a Fourth Amendment detention or seizure, the test is whether, "taking into account all the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chestnut*, 486 U.S. 567, 569 (1988)). Examples of things that would indicate a seizure, "even where the person did not attempt to leave, would be the threatening presence of several officers . . . some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554; *see also United States v. Clark*, 743 F.2d 1255-1258-59 (8th Cir. 1984). This Circuit has held that a reasonable person would not feel free to leave after being informed that an officer intends to subject his or her vehicle to a dog sniff. *See United States v. Beck*, 140 F.3d 1129, 1135-36 (8th Cir. 1998) ("At that point, having been ordered out of his vehicle in order to permit a drug dog

sniff, a reasonable person in Beck's situation would not have felt free to leave.").

What started out as a consensual encounter quickly ripened into a seizure under the Fourth Amendment. Here, there were several factors that would indicate a seizure. First, there was the "threatening presence of several officers." *See Mendenhall*, 446 U.S. at 554. Based on the dash-camera video, there were at least five officers present on the scene and one drug dog. It is not clear whether officers physically touched Leon's person or what sort of tone they used when conversing with him.

However, it is clear that Leon would not have felt free to leave. Even after complying with all of Craig's requests and questions—including unlocking the door to the trailer—Craig intended to subject his rig to a dog sniff. *See, e.g., Beck*, 140 F.3d at 1135-36. Leon was thus not free to leave. At that point, the consensual encounter had become a seizure. Leon was not free to leave, nor would he have reasonably felt free to leave. Such detention violated Leon's constitutional right, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . but upon probable cause . . . ."

**B. <u>The Seizure Was Unconstitutional Because Law Enforcement Had No Reasonable Suspicion to Extend the Encounter in Order to Conduct a Canine Sniff of Leon's Truck</u>**

In *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2014), the Supreme

Court of the United States held:

> [A] police stop exceeding the time needed to handle the matter for which the
> stop was made violates the Constitution's shield against unreasonable
> seizures. A seizure justified only by a police-observed traffic violation,
> therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably
> required to complete th[e] mission' of issuing a ticket for the violation.

(quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Authority for the seizure

thus ends when tasks tied to the traffic infraction are—or reasonably should have

been—completed." *Rodriguez*, 135 S. Ct. at 1614 (citing *United States v. Sharpe*,

470 U.S. 675, 686 (1985)).

Beyond determining whether or not to issue a traffic ticket, an officer's

mission includes "ordinary inquiries incident to the stop." *Rodriguez*, 135 S. Ct. at

1615 (citing *Caballes*, 543 U.S. at 408). Such inquiries include checking the

driver's license, determining if there are any outstanding warrants against the

driver, and inspecting the vehicle's registration and proof of insurance. *See*

*Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979). These checks serve the same

objective as enforcement of the traffic laws, which is to ensure that cars on the

road are being driven safely and responsibly. *Rodriguez*, 135 S. Ct. at 1615.

A dog sniff, by contrast, is aimed to "detect evidence of ordinary criminal

wrongdoing," *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000), and "is not

fairly characterized as part of the officer's traffic mission" because it lacks the

8

same close connection to roadway safety as the ordinary inquiries mentioned above. *Rodriguez*, 135 S. Ct. at 1615. This is why the Supreme Court of the United States held that police may not extend an otherwise-complete traffic stop in order to conduct a dog sniff absent reasonable suspicion. *Id.* at 1612.

To continue to detain a vehicle's occupants after an initial stop is completed, the law enforcement officer must have been aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Donnelly*, 475 F.3d 946, 952 (8th Cir. 2007) (quotation omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968)). "Whether an officer has reasonable suspicion to expand the scope of the traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience." *United States v. Gill*, 513 F.3d 836, 844 (8th Cir. 2008) (quotation omitted). Accordingly, Craig must have had a particularized and objective basis for suspecting that Leon was engaged in trafficking drugs.

In *Rodriguez*, an officer stopped Rodriguez for driving on a highway shoulder in violation of Nebraska law. *Rodriguez*, 135 S. Ct. at 1612. After the officer checked the driver's license of both occupants, ran their records, and issued a warning for the traffic offense, he asked Rodriguez for permission to walk his dog around the car. *Id.* at 1613. When Rodriguez reused, the officer detained him until a second officer arrived. *Id.* The first officer then conducted a dog sniff which

9

ultimately led to the discovery of methamphetamine. *Id.* A period of seven or eight minutes elapsed from the time the first officer issued the written warning and the dog alerting to Rodriguez's car. *Id.* The Supreme Court of the United States reversed Rodriguez's conviction and remanded for the lower courts to determine whether the officer possessed reasonable suspicion to prolong the stop to conduct the dog sniff. *Id.* at 1616-17.

Craig noted in his initial arrest report that during his "course of investigation reasonable suspicion developed." *See Exhibit B*. However, this suspicion appears solely based on Craig's belief that Leon "seemed very nervous," despite that Craig mentioned no specific, articulable reasons justifying this observation. Nor did Craig note what, if any, criminal activity he suspected. Nothing about Leon's demeanor could be interpreted as nervous. Leon's hands were not shaking. He did not avoid eye contact. Leon gave a consistent story regarding the purpose of his travels, which Craig investigated and ultimately confirmed.

Leon was cooperative throughout the encounter. He acknowledged that he should not have been parked on the shoulder of the entrance ramp. He explained to the officer that he only did so in order to communicate with his dispatcher. When asked about the presence of contraband, he denied that there was any present. When asked for permission to search the trailer, he gave it. And when asked to

remove the padlock and open the rear door, he willingly complied. And just as

Leon told Craig, the trailer was fully loaded with furniture.

Furthermore, Craig noted no other new information developed during the

course of the encounter that would justify further detention based on suspicion of

drug-trafficking or indeed any other crime. Craig noted no information that Leon

had prior convictions.[1] Craig did not note any odor of controlled substances or

other contraband, *see, e.g., United States v. Woods*, 829 F.3d 675, 679 (8th Cir.

2016) (holding that officer's detection of odor of marijuana in the defendant's

vehicle supported the officer's reasonable suspicion for drug-trafficking and thus

justified extension of the stop), or the presence of masking odors. *See, e.g., United*

*States v. Bloomfield*, 40 F.3d 910, 40 F.3d at 918-19 (8th Cir. 1994) (en banc).

There were no items commonly used for manufacturing or trafficking drugs

present. *See, e.g., United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000)

Craig did not note any information he knew about before approaching Leon

that would give rise to such reasonable suspicion. *See, e.g., United States v.*

*Maltais*, 403 F.3d 550, 556-58 (8th Cir. 2005) (holding that detention of more than

90 minutes to get a canine on the scene was reasonable when officer had

knowledge that suspect's car had hidden compartments and "that intelligence

information suggested he was involved in a drug smuggling ring"). Leon made no

---

[1] In fact, Defendant Leon has no prior convictions, either in federal or Arkansas state courts.

conflicting statements regarding the purpose of his travels. *See e.g.*, *United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003). Further, when Craig inspected Leon's cargo, he "observed that the trailer appeared to be fully loaded with furniture as [Leon] had said." *Exhibit A*, at 1-2. *See, e.g., United States v. White*, 42 F.3d 457, 460 (1994) (holding that officer had reasonable suspicion to extend a traffic stop more than an hour, in part, because the suspect's cargo did not match up with his description and because he did not have a bill of lading or permits for transporting the cargo). Based on the totality of the circumstances, Craig did not develop reasonable, articulable suspicion that Leon was transporting drugs.

Craig did not develop reasonable suspicion that Leon was committing any crime during the course of his investigation. Just as in *Rodriguez*, it was only after completing the "ordinary inquiries" incident to the encounter that Craig requested consent to search Leon's rig. He observed a traffic violation, inspected Leon's bill of lading and logbook, confirmed that the driver was not having an emergency, and ultimately observed that the contents of the truck's trailer were just as the driver had claimed. At that point, Craig should have written a warning or ticket for the traffic violation, or terminated the encounter without further official action. His request for consent to search the rig absent particularized, specific suspicion of criminal wrongdoing was an unconstitutional extension of the stop for inquiries not associated with the

12

"mission" of the encounter. Craig did not even perform many of the "ordinary inquiries" in his rush to search Leon's rig. Craig did not inspect Leon's license or proof of insurance, or run him for active warrants. The purpose of the encounter was to assist a potential motorist in distress. Once Craig determined that Leon was not having an emergency and that Leon's paperwork checked out, Craig did not have reasonable suspicion to extend the stop any further.

### C. The Seizure In This Case Was Not a *De Minimis* Intrusion

In *Davis v. United States*, 564 U.S. 229, 232 (2011), the Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." When Leon's rig was stopped in March 2015, the law of this Circuit provided that a brief delay to conduct a dog sniff was not an unconstitutional seizure, so long as the stop was not unreasonably prolonged. *United States v. Rodriguez*, 799 F.3d 1222 (2015). Prior to the Supreme Court's decision in *Rodriguez* in April of 2015, this Circuit held that *de minimis* intrusion on a driver's personal liberty did not violate the Fourth Amendment. *See, e.g.*, *United States v. Alexander*, 448 F.3d 1014, 1016-17 (8th Cir. 2006) (holding that a four-minute delay between officer informing driver he was getting a warning ticket and conducting the dog sniff was a *de minimis* intrusion); *United States v.*

13

*Martin*, 411 F.3d 998, 1002 (8th Cir. 2005) (holding that a two-minute delay to conduct dog sniff was a *de minimis* intrusion); *United States v. $ 404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000) (holding two-minute delay for sniff a *de minimis* intrusion); *United States v. Morgan*, 270 F.3d 625 (holding that a delay of "well under ten minutes" between end of traffic stop and dog altering to marijuana was a *de minimis* intrusion).

By contrast, the intrusion in this case was substantial, rather than merely *de minimis*. It is unclear from the discovery file precisely how much time elapsed between when Craig completed the mission of the encounter and when the dog alerted to Leon's cargo at 4:09pm. However, based on the Arrest / Disposition Report, it appears that at least 39 minutes passed between the time that Craig either initially encountered Leon or when he arrested Leon and when the dog alerted to the trailer. This was significantly longer than any of the *de minimis* intrusions this Circuit has upheld in the past. Accordingly, it was not a *de minimis* intrusion, and was instead a violation of the Fourth Amendment.

### D. The Seizure of Leon's Person Exceeded the Bounds of a *Terry* Investigative Stop, and His Consent Was Thus Tainted by the Illegality.

"In the name of investigating a person who is no more than suspected of criminal activity," police may not "seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer*, 460 U.S. 491, 499 (1983)

14

(plurality) (citing *Dunaway v. New York*, 442 U.S. 200 (1979)). Such an investigative detention should "last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonable available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. Further, "it is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.*

Statements made during a period of illegal detention are inadmissible even though voluntarily given if they were the product of the illegal detention rather than an independent act of free will. *See Dunaway v. New York*, 442 U.S. 200, 218-19 (1979); *Brown v. Illinois*, 422 U.S. 590, 601-02 (1975).

In *Royer*, officers discovered that the defendant was travelling under an assumed name and previously knew that he paid cash for a one-way ticket and had checked two bags. *Royer*, 460 U.S. at 502. The Court determined that these were adequate grounds for suspecting the defendant of carrying drugs and for temporarily detaining him and his luggage. *Id.* Despite Royer's voluntary consent to search his luggage, the Court concluded "that at the time Royer produced his key to the suitcase, the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of

15

criminal activity." *Id.* The Court affirmed the reversal of Royer's conviction

because his consent was tainted by the illegal nature of his "confinement." *Id.* at

501.

Here, it appears that Leon was arrested at 3:30pm, a full 39 minutes before

the dog alerted to the cargo in his trailer. Even if this Court finds that law

enforcement did have reasonable suspicion to detain Leon, arresting him went far

beyond the permissible bounds of a consensual encounter or an investigative stop.

Like in *Royer*, Leon's consent was tainted by the illegal nature of his detention,

which appears to have risen to the level of a formal arrest.

### IV. <u>Leon's Consent to Search His Rig Was Involuntary</u>

Where the validity of a search rests on a defendant's consent, the State has

the burden of proving that the necessary consent was obtained and that it was not

freely and voluntarily given, something which is not satisfied by a mere

submission to a claim of lawful authority. *United States v. Cedano-Medina*, 366

F.3d 682, 684 (8th Cir. 2004). The government must show that a reasonable person

would have believed that the subject of the search gave consent that was "the

product of an essentially free and unconstrained choice," *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 255 (1973), and that the subject comprehended the

choice that he or she was making. *Cedano-Medina*, 366 F.3d at 684.

Though Craig was not required to provide Leon with a written consent form in his primary language, or to explicitly inform him of his right to withhold his consent, *see Ohio v. Robinette*, 519 U.S. 33 (1996), given that the defendant spoke only broken English and the trooper did not speak Spanish, "such measures would have been wise and certainly would have assisted the defendant in understanding what was happening and alleviating any perception of police domination." *United States v. Gallardo*, 2006 U.S. Dist. LEXIS 14327, at 42-43, 2006 WL 296413 (D. Neb., Feb. 6, 2006).

Here, Leon did not comprehend Craig's English questions and directives because he is primarily a Spanish speaker. There was no Spanish-speaking member of law enforcement on the scene. He was never advised of his rights or asked to give consent in his native language, either orally or in writing. His consent to search the trailer of his rig was thus involuntary.

## V. <u>The Dog Sniff Exceeded Leon's Scope of Consent to Search His Rig</u>

The boundaries of a consensual automobile search are confined to the scope of the consent given. *United States v. Martel-Martines*, 988 F.2d 855, 858 (8th Cir. 1993); *see also Walter v. United States*, 447 U.S. 649, 656. The scope of consent to search is measured using a standard of objective reasonableness. *United States v. Urbina*, 431 F.3d 305, 310 (8th Cir. 2005). The issue is what "the typical reasonable person [would] have understood by the exchange between the officer

17

and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). This Court must examine whether the search remained within the boundaries of the Defendant's consent, "both with respect to the physical scope of the search and its duration." *United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006).

Craig's decision to call in a canine to conduct a sniff exceeded both the physical scope of the search and its expected duration. It exceeded the scope because Craig did not ask for permission to get a canine on the scene to conduct a sniff of the rig. *See, e.g., United States v. Mayo*, 627 F.3d 709, 712 (2010) (where the suspect affirmatively gave consent for a dog sniff specifically). Further, Craig's decision to call in the canine extended the permissible duration of Leon's consent. Craig asked for permission to search, and had Leon open the door to his trailer. At this point, a reasonable person would have understood that the officer had completed the search. Lastly, it is unclear whether Leon made any effort to communicate an intent to withdraw his consent, or even where he was physically located during the time between consenting to the search and the dog alerting to his cargo. As such, the sniff exceeded the scope of Leon's consent.

WHEREFORE, the Defendant moves this Court to suppress the introduction into evidence by the United States of any such illegally obtained items or the fruits

of such illegal search and seizure, and respectfully prays for this Court to set a

hearing on this motion.

                                            Respectfully submitted,

                                            /s/ William O. "Bill" James, Jr.
                                            Ark. Bar No. 94108
                                            Attorney for Defendant
                                            James Law Firm
                                            1821 S. Broadway St.
                                            Little Rock, AR 72206
                                            (501) 375-0900
                                            Email: wmjamesjr@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

Chris Givens
Assistant United States Attorney
P.O. Box 1229
Little Rock, AR 72203

                                                /s/ William O. "Bill" James, Jr.

# AFFIDAVIT

IN THE CIRCUIT COURT OF LONOKE, LONOKE COUNTY, ARKANSAS AFFIDAVIT
FOR WARRANT OF ARREST FOR THE FOLLOWING PERSON

STATE OF ARKANSAS                VS        JAVIER LEON GARCIA


    PURSUANT TO RULE 7.1 OF THE ARKANSAS RULES OF CRIMINAL
PROCEDURE, THE UNDERSIGNED AFFIANT BEING DULY SWORN, DEPOSES AND
SAYS THAT HE HAS REASON TO BELIEVE THAT THE ABOVE NAMED PERSON
HAS COMMITTED THE OFFENSE OF VIOLATING ARKANSAS CODE ANN
5-64-440 Trafficking Methamphetamine

ON OR ABOUT THE 30th DAY OF March, 2015,

COMMITTED BY UNLAWFULLY;

Felony Trafficking Methamphetamine

IN LONOKE COUNTY, ARKANSAS, AGAINST THE PEACE AND DIGNITY OF THE
STATE OF ARKANSAS.

### FACTS CONSTITUTING PROBABLE CAUSE

I OBSERVED A TRACTOR TRAILER SITTING ON THE SHOULDER OF THE ENTRANCE RAMP FROM
KERR ROAD TO I-40 EAST. I PULLED IN FRONT OF IT AND GOT OUT TO CHECK, WHEN I NOTICED THE
DRIVER WAS SITTING AT THE WHEEL. I STEPPED ON TO HIS DOORSTEP TO SEE WHAT THE TROUBLE
WAS. HE SEEMED VERY NERVOUS AND MADE IT KNOWN TO ME THAT HE KNEW HE WAS NOT
SUPPOSE TO PARK THERE, BUT INDICATED HE HAD TO TALK TO HIS DISPATCH. I ACKNOWLEDGED
THAT HE WAS NOT SUPPOSED TO PARK THERE, BUT HE CONTINUED TALKING ABOUT IT. HE ASKED
IF IT WAS OKAY TO PARK THERE IN AN EMERGENCY. I ASKED HIM IF HE WAS HAVING AN
EMERGENCY AND HE SAID HE WAS NOT. I ASKED HIM WHAT HE WAS HAULING AND HE INDICATED
HE HAD 20 DROPS OF FURNITURE. HE ALSO TOLD ME THAT HE OWNED THE FURNITURE STORE
WHERE HE LOADED. I ASKED IF I COULD LOOK AT HIS BILL OF LADING AND IT SHOWED HE LOADED
ON THE 26TH OF MARCH. I ASKED IF I COULD LOOK AT HIS LOG BOOK AND IT SHOWED HE WAS OFF
ABOUT 2 WEEKS PRIOR TO THE DATE ON THE BILL OF LADING, BUT THAT HE DID NOT LEAVE
CALIFORNIA UNTIL THE 28TH OF MARCH. I ASKED LEON ABOUT THERE BEING ANYTHING ILLEGAL
IN THE VEHICLE AND HE TOLD ME THERE WAS NOT, BUT I STILL BELIEVED HE WAS VERY
UNCOMFORTABLE ABOUT THE QUESTION. I MENTIONED SPECIFIC DRUGS BY NAME AND TO EACH
HE HELD HIS HANDS STRAIGHT UP PALMS TOWARD ME, MOVED HIS HEAD FROM SIDE TO SIDE AND
SAID NO SEVERAL TIMES TO EACH SPECIFIC. I FELT THE RESPONSE WAS AN OVER REACTION TO
THE NORMAL AND PERCEIVED IT AS NERVOUSNESS ON HIS PART. I ASKED FOR PERMISSION TO
SEARCH THE VEHICLE AND HE GRANTED IT. I TOLD HIM THAT HE HAD THE RIGHT TO TELL ME NO
AND ASKED IF IT WAS STILL OKAY FOR ME TO SEARCH HIS VEHICLE. HE AGAIN SAID IT WAS OKAY. I
ASKED HIM TO TAKE THE PADLOCK OFF THE REAR DOOR AND OPEN ONE DOOR. WHEN HE DID I
OBSERVED THAT THE TRAILER APPEARED TO BE FULLY LOADED WITH FURNITURE AS HE HAD



EXHIBIT
A

SAID. I DECIDED TO GET A CANINE TO THE SCENE AND CONTACTED TROOPER CHASE MELDER. TROOPER MELDER ARRIVED ON SCENE AND DEPLOYED K-9 PAVETT. K-9 PAVETT INDICATED TO THE TRACTOR TRAILER. TROOPER MELDER THEN INSPECTED THE CARGO AND LOCATED SUSPECTED LIQUID METHAMPHETAMINE AND CRYSTAL METHAMPHETAMINE. THE SUSPECTED METHAMPHETAMINE WAS LOCATED ABOUT A THIRD OF THE WAY INSIDE OF THE TRAILER COMINGLED WITH THE LEGIMATE LOAD OF CARGO. I THEN HANDCUFFED THE SUSPECT AND PLACED LEON IN THE REAR OF MY VEHICLE. I DROVE THE TRACTOR AND SEMI-TRAILER TO THE CO-OP BETWEEN LONOKE AND CARLISLE WHERE IT WAS OFF LOADED. THE TRAILER WAS OFFLOADED TO THE POINT WHERE WE COULD RETRIEVE 6 CLEAR JUGS AND 1 WHITE JUG OF LIQUID. I BELIEVE THE LIQUID TO BE METHAMPHETAMINE OIL. THERE WAS ALSO A WHITE SACK THAT CONTAINED 20 BUNDLES. THE 20 BUNDLES WERE WRAPPED INDIVIDUALLY AND THEY CONTAINED A CLEAR CYRSTAL SUBSTANCE, BELIEVED TO BE METHAMPHETAMINE. THE TOTAL WEIGHT WAS 276 POUNDS GROSS. THE BOTTELS OF LIQUID METHAMPHETAMINE AND THE 20 BUNDLES OF METHAMPHETAMINE WERE TRANSPORTED TO THE LONOKE COUNTY SHERIFF DEPARTMENT. CPL TRENTON BEHNKE ASSISTED AND HE RELEASED THE EVIDENCE TO LITTLE ROCK PD OFFICER BARRY FLANNERY FOR PROPER STORAGE. CPL. BEHNKE ALSO MADE OUT THE SEIZURE FORFEITURE FORM TO CONFISCATE THE TRACTOR AND TRAILER WHICH I ESTIMATE WOULD BE VALUED AT $75,000.00. THE SUSPECT WAS JAILED AT LONOKE COUNTY DETENTION CENTER FOR TRAFFICKING METHAMPHETAMINE.

_____
AFFIANTS SIGNATURE

SUBSCRIBED AND SWORN BEFORE ME THIS 31 DAY OF March 20 15.

BY _____

(NOTARY PUBLIC)
My Commission expires the 15 day of July 20 19

I HEREBY FIND THAT THIS SWORN AFFIDAVIT DEMOSTRATES REASONABLE CAUSE FOR THE ISSUANCE OF A WARRANT OF THE ARREST FOR THE ABOVE NAMED INDIVIDUAL FOR THE ABOVE STATED OFFENSE.

_____
JUDGE

3-31-15
_____
DATE

4

ARKANSAS CRIME INFORMATION CENTER
## LONOKE COUNTY ARREST / DISPOSITION REPORT

| | Arresting Agency Name | | NCIC Code |
|---|---|---|---|
| | ASP | | |

**DEFENDANT IDENTIFICATION**

Name: Last: Leon   First: Javier   Middle:

Aliases: 9151

Street Address: 26 9151 Huxlle Drive   Phone No. 902 911011

City & State: Moreno Valley CA   Zip:

Computerized CSN:   FBI No.   SID No.   Local ID No.

Social Security No.: 620 83 234   Driver License No./State:

Sex: ☒ M ☐ F   Race: 1 ☒ White  2 ☐ Black  3 ☐ American Indian or Alaskan Native  4 ☐ Asian or Pacific Islander  5 ☐ Unknown   Ethnicity: ☒ Hispanic ☐ Not Hispanic   Date of Birth: mo. 04 day 19 yr. 61 '53   Age:   Place of Birth: Moreno Riverside CA

Hair: Blk/Gray   Eyes: Brown   Weight: 196   Height: 5 6"   Scars and Marks: Unk Chest on leFt Shoulda

Complexion: Brown   Build: Meel   Employer/Occupation:

Name of Nearest Relative: Obdulia Leon   Phone: 902 992-9296

Street Address: 26055 Huxle Drive Moreno   City, State, Zip: Moreno Vly CA

### PLEASE PRESS HARD - You are making five copies!

**ARREST**

Place of Arrest: I-40 EB Kerr ON-Ramp   Arresting Officers: Olon Craig

Date of Arrest: 3/30/15   Time of Arrest: 1530   Bond Amount Set: NOTond   Case No.:   Agency Received From: ASP   Agency Transferred To: Lonoke S.O.

| No. | Computer USE - SRN | Case/Docket No. | Statute No. | Counts | Charge Desc. | Offense Class | Date of Action |
|---|---|---|---|---|---|---|---|
| 1 | | | 564-240 | 1 | Trafficking Meth | Y Felony | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |

Facts of Arrest (Explain in Detail): Subject Contacted on a Motorist Assist. Course Investigation Reasonable Suspicion developed. K-9 Alert Search of Tactor Trailer led to 276 lbs of Methamphetamine.

Fingerprint Card: ☐ Yes ☐ No   More Charges? ☐ Yes ☐ No

Receiving Jailer:   Court Date:   Court Trying Case:

Right Thumb Print

| Complainant and Witness Names | Address | |
|---|---|---|
| Complainant | Home | |
| | Business | |
| Witness | Home | |
| | Business | |
| Witness | Home | |
| | Business | |

**EXHIBIT**

**B**

ASP 232
Rev. 05/10



# ARKANSAS STATE POLICE

## K-9 Search/Find Log

Date __03/30/15__                    Time __4:09 PM__

Canine __Pavatt__                    Handler __Cpl. Chase C. Melder #160__

Detection Type  Narcotics

| | |
|---|---|
| Type of sniff | Vehicle |
| Location of search | **I-40 Kerr Road** |
| Type of substance detected | Methamphetamine |
| Location of detected substance | **Trailer** |
| Amount of substance detected | **276 lbs** |
| Location where K-9 alerted to the odor | **Under Trailer Near in front of rear tires** |
| Location where substance was seized by handler | I-40 Kerr Road |
| How was substance packaged | **Liquid Jugs, Plastic wrap w/ oil and detergent** |
| Diversion odor Present Yes    If yes, type | **Oil and Detergent** |
| Residual odor present? | No |
| Deployment Type | Consent |
| Deployment Result | Alert with find |

Remarks: Sr. Cpl. Olen Craig made a consentual encounter with the driver of a tractor trailer on the on-ramp of Interstate 40 at Kerr Road. After speaking with the driver, Sr. Cpl. Craig asked for and was granted consent to search the vehicle. Due to the way the trailer was loaded, Sr. Cpl. Craig asked me to deploy Pavatt to sniff the vehicle. During the free air sniff, Pavatt ran full speed down the passenger side of the vehicle and around the front. As Pavatt was running back toward the rear of the vehicle, he slowed down, to a walk, and started sniffing under the trailer. Pavatt spent a lot more time sniffing that area than what is normal. Pavatt's tail was wagging, his mouth was closed and his sniffing was more intense. These are the same changes in behavior I have seen before when Pavatt smell narcotics. Pavatt continued to the back of the trailer where he showed the same changes in behavior. During the detail sniff, Pavatt showed the behavior changes again under the trailer and in the same area as before. I crawled the load of the trailer and discovered a large amount of liquid methamphetamine and a large amount of crystal methamphetamine. The narcotics were located above where Pavatt alerted on the trailer.

EXHIBIT

C