IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.   4:15-cr-00142-1 - JM |
| | ) | |
| JAVIER LEON | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT LEON'S
MOTION TO SUPPRESS**

Comes now the United States of America, by and through its attorney, Christopher R. Thyer, United States Attorney for the Eastern District of Arkansas and Chris Givens, Assistant United States Attorney for said district, in opposition to defendant Leon's Motion to Suppress. Specifically, the United States maintains that (1) there was reasonable suspicion and probable cause to search the vehicle, (2) and, regardless, the defendant gave knowing and voluntary consent to search his vehicle.

## I.    <u>Relevant Facts</u>

On March 30, 2015, while on patrol, Arkansas State Police Senior Corporal Olen Craig observed an 18-wheel tractor trailer parked illegally on an on-ramp to Interstate 40, in Lonoke County, Arkansas. Knowing that a driver emergency is the only permissible reason for parking on an on-ramp, Corporal Craig pulled in front of the truck for a welfare check on the driver. At the time of this encounter, Corporal Craig had been an Arkansas State Trooper for 34 years, and had been a certified truck driver for 30 of those years.

Just before 4 p.m., Corporal Craig made contact with the truck's driver and owner, defendant Javier Leon, age 55. Leon (in English) stated that he knew he was not supposed to be

parked there. Leon then asked if it was permissible to park there if he had an emergency.

Corporal Craig said it was permissible in an emergency, and asked Leon if he was having an

emergency. Leon said "No." Corporal Craig then asked for and received Leon's logbook and bill

of lading, which displayed discrepancies. Leon appeared very nervous while speaking with

Corporal Craig, which prompted Corporal Craig to ask if the truck contained anything illegal.

Leon, according to Corporal Craig, became very uncomfortable with the question, and the degree

of his nervousness heightened. When asked about specific drugs by name Leon gave answers

with exaggerated hand motions that Corporal Craig believed in his experience were gross

overreactions and indicated this heightened nervousness on the part of Leon.

      Based on the totality of this interaction, and Leon's extreme nervousness, approximately

five minutes into the encounter Corporal Craig asked for permission to search the vehicle. Leon

gave permission to search. Corporal Craig followed up by explaining that Leon had a right deny

permission to search, and again asked if it was okay to search the vehicle. Again, Leon consented

to the search.

      Corporal Craig began the search with a brief check inside the cab of the truck for

weapons, and then moved to the trailer, which was padlocked. Corporal Craig asked Leon to

open the padlock and one door, and Leon complied. The visible portion of the trailer was packed

with furniture boxes, and Corporal Craig was physically unable to go inside the trailer to

continue the search. At this point, Corporal Craig called Arkansas State Police Corporal Chase

Melder and his K-9 unit, Pavatt, to continue the search. The total time elapsed from when

Corporal Craig pulled in front of Leon's parked vehicle to when he called Corporal Melder was

less than 10 minutes.

Corporal Melder and Pavatt arrived at the scene approximately five minutes after receiving the call from Corporal Craig. Corporal Craig and Leon remained in front of the vehicle while Pavatt ran the trailer, and was not in custody. Near the rear of the trailer Pavatt exhibited behavior consistent with his known behavior when he smells narcotics. This process took approximately four minutes. Following the positive K-9 alert, Corporal Melder crawled inside the trailer, over some furniture boxes, and located methamphetamine near the area where Pavatt alerted. At this time Leon was arrested, handcuffed, and placed in the rear of Corporal Craig's police car. The entire encounter, from the time Corporal Craig pulled to the side of the road until the time Leon was arrested and placed in the back of a police car, took less than 30 minutes.

Following Leon's arrest, he was transported to the Lonoke County detention facility, where he waived his *Miranda* rights and consented to a videotaped interview that lasted more than 60 minutes. At no time during this interview did Leon ask for a translator or state he did not understand a question. In fact, Leon understood and answered all basic questions, including nuanced questions such as "are you a citizen or resident alien?" Leon said he understood why the state trooper approached him, gave an explanation of why he pulled over, and gave detailed information about his route, his work history, his home life, along with many other details. All conversation, on the side of the road and in the custodial interview, took place in English.

Leon states in his motion that it is "unclear how much time elapsed between Corporal Craig's decision to get a canine on the scene and when Corporal Melder conducted the dog sniff." Def. Motion at 3. The United States agrees that the available reports and documents do not clearly define the timing of this traffic stop, and an evidentiary hearing is needed to fully answer this question. The United States submits, however, that the document Leon describes as

"an initial arrest report" and attached as Defendant's Exhibit B is not a document created or provided by Corporal Craig, and should not be relied upon to determine specific timing of events. Rather, Exhibit B is an "Arrest and Disposition Report" produced, written, and filled out by workers in the Lonoke County Sherriff's office for processing purposes, and the time listed as the "time of arrest" (15:30) is not an accurate reflection of when Leon was actually arrested.

The Arkansas State Police "Arkansas Uniform Incident Report," attached as Government's Exhibit A, conversely, was created by Corporal Craig and is the most accurate written account of the events in question. This report accurately reflects that Corporal Craig's encounter with Leon began at approximately 4 p.m. This time is consistent with Corporal Craig's report indicating that he spoke with Leon for only a few minutes before calling Corporal Melder and Pavatt. Corporal Melder's dashcam video shows him beginning the dog sniff at approximately 4:09 p.m. Leon was arrested at approximately 4:25, after the dog sniff and subsequent search by Corporal Melder.

## II.  Law and Argument

In his motion, Leon challenges the search and subsequent seizure of methamphetamine, on alternative grounds. Initially, Leon argues that what was a consensual encounter turned into a seizure that implicated the Fourth Amendment, and law enforcement did not have reasonable suspicion to search the trailer or conduct a dog sniff. Leon does recognize that police are permitted to conduct investigative stops, or *Terry* stops, but he argues this encounter exceeded the scope of a *Terry* stop. In another argument, Leon asserts that his consent was not voluntary due to English not being his native language. In his final arguments, Leon again concedes that he did give voluntary consent, but argues that the dog sniff exceeded the scope of that consent.

4

In this case, Leon, who understands and speaks English, gave knowing and voluntary consent to search his trailer. The subsequent 10-to-15-minute search, which included a dog sniff, did not exceed the scope of that voluntary consent and did not run afoul of the Fourth Amendment. However, even without that voluntary consent, Corporal Craig had reasonable suspicion to search the trailer and call for K-9 Pavatt, making the detention of Leon and search of the trailer lawful.

### A.  The encounter and subsequent search did not violate the Fourth Amendment

Leon does not contest the legitimacy of the initial approach by Corporal Craig; Leon was parked illegally on the on-ramp. The issue is whether Corporal Craig unlawfully extended the encounter at the point he sought consent to search the trailer and called for a dog sniff.

"A seizure that is justified solely [as a stop for a traffic issue] can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Once the officer finishes the tasks involved with the traffic stop "the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, *unless* something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention *or unless* the continued encounter is consensual." *United States v. Quintero–Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (internal citations omitted) (emphasis added); s*ee also United States v. Englehart*, 811 F.3d 1034, 1040–41 (8th Cir. 2016). An officer has "reasonable suspicion" necessary to briefly detain a suspect if the circumstances show that the officer could "articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity" and possessed "at least a minimal level

of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (internal quotations omitted).

In determining whether an officer had reasonable suspicion, the court must consider the totality of the circumstances in light of the officer's experience. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (finding, that "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."). "Factors that may reasonably lead an experienced officer to investigate include the time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995). "[T]he standard employed is less demanding than the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that the information must exhibit." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (quoting *United States v. Spotts*, 275 F.3d 714, 718 (8th Cir. 2002)).

In this case, both requirements necessary to lawfully extend a stop beyond the traffic violation were present—Corporal Craig, a very experienced trooper, had reasonable suspicion to justify further detention and the continued encounter was consensual. Additionally, as will be discussed, *infra*, even if there was no reasonable suspicion AND the consent was not voluntary, the limited delay as a result of the dog sniff (which resulted in probable cause) was *de minimis* and lawful.

### i.     Reasonable suspicion

Putting aside the question of Leon's consent for the moment, Corporal Craig clearly articulated the reasonable suspicion he had: Leon appeared to be nervous from the beginning of the stop, and that nervousness escalated to unusually high levels when he was asked about specific drugs that may or may not be in his trailer. *See United States v. Bloomfield*, 40 F.3d 910, 918–19 (8th Cir. 1994) (explaining that "although it is customary for people to be somewhat nervous" when stopped by police, extreme nervousness may contribute to an officer's reasonable suspicion). Additionally, Corporal Craig, an experienced trooper and truck driver, observed discrepancies in Leon's logbook that gave him concern criminal activity may be afoot.

Once Corporal Craig developed that reasonable suspicion, everything that occurred following was lawful, including the dog sniff which created probable cause to continue the search. *See United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999) *abrogated on other grounds by Rodriguez v. United States*, 135 S. Ct. 1609 (2015) ("[O]nce [K-9] Fanta alerted on the exterior of Alexander's trailer, Officer Ward had probable cause to search the trailer's interior without a warrant."). Absent this reasonable suspicion, however, the search was still lawful, because of the extremely brief intrusion of Leon's liberty.

### ii.     *De minimis* dog sniff

Leon correctly cites and summarizes the state of the law prior to the decision in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), namely, that dog sniffs which occurred prior to the *Rodriguez* decision in April 2015 were constitutional even without reasonable suspicion provided they did not unreasonably prolong the stop. Def. Motion at 13. Although *Rodriguez* has changed this law and analysis, at the time of Corporal Craig's encounter with Leon, "even

7

without reasonable suspicion following the completion of a traffic stop, 'seizures of less than ten minutes [were permissible] as *de minimis* intrusions [and did] not amount to an unreasonable seizure.'" *Englehart*, 811 F.3d at 1041 (*quoting United States v. Robinson*, 455 F.3d 832, 834 (8th Cir. 2006).[1]

Leon argues that the delay between the time Corporal Craig completed the necessary tasks of inquiring about the reason for Leon's stop on the on-ramp and the time the dog arrived is not a *de minimis* intrusion, and therefore unlawful. Def. Motion at 13. It is true that "[a] dog sniff may be the product of an unconstitutional seizure if the traffic stop is unreasonably prolonged before the dog is employed." *Caballes*, 543 U.S. at 407–08. However, Leon premised this argument on incorrect facts—39 minutes did not pass from the time Craig either encountered Leon or arrested Leon and when the dog alerted. Indeed, the entire encounter, from start to finish, did not last 39 minutes. Corporal Craig spoke to Leon for less than 10 minutes before beginning the search. After only a few minutes of searching, Corporal Craig called for the drug dog. Corporal Melder arrived with Pavatt approximately five minutes after that, or less than 10 minutes after Corporal Craig finished his inquiries into why Leon was stopped on the on-ramp.

"[W]hen police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one ... the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times." *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc). In *United States v. Lyons*, the Eighth Circuit found that the drug dog arriving 31 minutes from the time routine business of the traffic stop was completed, and 25 minutes after the K-9 handler was called, was not an unnecessary delay. 486

---

[1] If the search is conducted in reasonable reliance of existing law at the time (as this search was), the exclusionary rule will not apply if that law is later overruled. *Davis v. United States*, 564 U.S. 229, 232 (2011).

F.3d 367, 372 (2007). *See also United States v. Mohamed*, 600 F.3d 1000, 1005 (8th Cir. 2010) (canine search conducted within five minutes of conclusion of a lawful stop was a *de minimis* intrusion on driver's personal liberty); *United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006) (detention of at most four minutes from the point defendant notified he would receive a warning ticket to the time of the dog sniff only a *de minimis* intrusion); *United States v. Donnelly*, 475 F.3d 946, 951, 954 (8th Cir. 2007) (holding that a fifty-nine minute detention to wait for a drug dog was reasonable where the officer requested the dog immediately after developing reasonable suspicion). Following the existing law at the time of the stop, the brief extension of time to for Corporal Craig to begin the search, and then wait for the drug dog Pavatt and Corporal Melder to complete the search, was not unreasonable or unlawful.

However, as indicated, the *was* reasonable suspicion in this case, and therefore an analysis of whether the delay was *de minimis* is not necessary. Supported by reasonable suspicion, the extension of Corporal Craig's encounter with Leon in order to conduct a dog sniff does not violate the Constitution's shield against unreasonable seizures. *Rodriguez*, 135 S. Ct. at 1615–16.

### iii.    Voluntary consent

The United States submits that reasonable suspicion and then probable cause existed which legally justified Leon's brief detention and Corporals Craig and Melder's search of the trailer. However, now addressing the issue earlier set aside, even without reasonable suspicion, the search became lawful as soon as Leon gave voluntary consent. "A trooper may extend a traffic stop beyond its normal completion if the encounter has become consensual." *United States v. Rivera*, 570 F.3d 1009, 1013 (8th Cir. 2009). "When a motorist gives consent to search his

vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted, and Trooper [Craig] reasonably could rely on [Leon's] oral consent as a basis to extend the encounter." *Id.* at 1013–14. The question, therefore, is did Leon give valid consent.

"The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances,'" *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973)). "The question of voluntariness requires a broad factual inquiry; there is no bright-line rule to determine when an essentially free and unconstrained choice becomes one that is the result of duress or coercion." *United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006) (internal quotations and citations omitted). Instead, we consider the totality of all the circumstances. *Id.* (internal quotations omitted). Ultimately, the question is whether Leon's "will ha[d] been overborne and his capacity for self-determination critically impaired" such that his consent to the search the trailer was involuntary. *United States v. Watson*, 423 U.S. 411, 424 (1976) (quotations omitted). The analysis required to answer that question requires examining a number of factors, "[s]ome relat[ing] to the characteristics and behavior of the defendant, ... [o]thers relat[ing] to the environment surrounding the defendant at the time he gave his consent, ... [and s]till others relat[ing] to the interaction between police and the defendant in the encounter." *Willie*, 462 F.3d at 896. "No one factor is dispositive." *Id.*

The primary "factor" Leon points to in arguing his consent was not voluntary is his lack of proficiency in the English language. It is undisputed that Leon is a native Spanish speaker and he is more proficient in Spanish than English. Notwithstanding this "language barrier," the events of March 30, 2015, including multiple interviews, all took place in English without

10

incident. Leon was sober, and at no point did Leon indicate that he had trouble understanding English. Nor did he exhibit an inability to speak it in his own right. Quite the contrary, his responses were coherent and went beyond simple "yes" and "no" answers. Leon's responses—both to Corporal Craig on the side of the road and to the federal agents conducting the lengthier interview—showed his grasp of English. All of this comes as no surprise. Upon arrest, defendant had been a lawful permanent resident in the United States for decades, and had worked at the California trucking company for nearly two decades. Also, Leon acknowledged he had previous experience with the criminal justice system, explaining to federal officers that he had previously been arrested for driving under the influence, and explained how he got his truck driving license back.

Courts routinely uphold consent or waivers of rights by those with equal or lesser English proficiency. *See, e.g., United States v. Gayekpar*, 678 F.3d 629, 639 (8th Cir. 2012) ("spoke English during the entire interview" and agent "had no problem understanding him"); *United States v. Marquez*, 605 F.3d 604, 609 (8th Cir. 2010) ("had no difficulty communicating" and "responded in English" when "questioned in English"); *United States v. Shan Wei Yu*, 484 F.3d 979, 985 (8th Cir. 2007) (gave "detailed information in English" and spoke "without a misunderstanding based on language"); *United States v. Perez*, 200 F.3d 576, 579-80 (8th Cir. 2000) (answers showed understanding of questions despite language problems). In *United States v. Carrate*, the Eighth Circuit held that the defendant's age, sobriety, and previous experience with the criminal justice system all suggested that he voluntarily consented to the search, despite his supposed limited ability to speak English and the fact that he gave answers in "broken English." 122 F.3d 666, 667, 670 (8th Cir. 1997).

In judging all the factors, it is important to also recognize that after Leon gave initial consent, Corporal Craig made clear to explain to him that he had an absolute right to refuse consent (despite not being required to do so), and again Leon allowed the search. "[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Bustamonte*, 412 U.S. at 248–49. Thus, Leon orally consented twice. "[W]hether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998). The Eighth Circuit has previously held that this "double" consent meets this reasonable standard. *See United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004).

The totality of the interaction between Leon and law enforcement officers, coupled with Leon's age, sobriety, and experience with the American criminal justice system make clear that Leon's consent was voluntary.

### iv.    Score of consent

Last, Leon argues that even if his consent was voluntarily given, the dog sniff exceeded the scope of that consent. Again, this is false. It is well-settled that law enforcement officers may rely on consent as the basis for a warrantless search, but they have no more authority than that granted by the scope of the consent. *Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991). The scope of consent to a search is "generally defined by its expressed object" and determined by "what . . . the typical reasonable person [would] have understood by the exchange between the officer and the suspect[.]"). *Jimeno*, 500 U.S. at 251.

12

In this case, there can be no doubt that a search for illegal drugs was the express object of Corporal Craig's search. Prior to the search Corporal Craig asked Leon if he had any drugs in the vehicle, even specifying different drugs he was inquiring about (cocaine, methamphetamine, etc.) by name. Additionally, Leon placed no qualifications on the search. *See United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007). When Leon opened the back trailer door, Corporal Craig saw furniture boxes packed floor to ceiling. Contrary to Leon's position, no reasonable person would think the search would end at that point, and established case law makes clear that the Fourth Amendment does not require it to end at that point.

"When [Leon] voluntarily gave a general statement of consent to search his truck, he authorized a search for the items about which [Corporal Craig] had questioned him. . . . It was objectively reasonable for [Corporal Craig] to search any part of the truck where these items might be stored." *United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006). *See also Jimeno*, 500 U.S. at 252 (holding that if a defendant's consent to search a vehicle "would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization" to open the container.). Indeed, when Leon gave consent to search "it was reasonable for the officer to believe that the owner's consent extended to a compartment that was an integral part of the vehicle." *Barragan*, 379 F.3d at 530. There is no doubt that the trailer is an integral part of an 18-wheel tractor-trailer.

Once determined that the search of the trailer for drugs did not exceed the scope of Leon's consent, it is clear that waiting five minutes for Corproal Melder and Pavatt to arrive was permissible. *See United States v. Ross*, 263 F.3d 844, 846 (8th Cir. 2001); *see also analysis Part II.A.ii, supra*. Leon, who was not in custody and free to speak at any point, never objected to any

13

part of the search, or to the appearance of Pavatt. *See United States v. Gray,* 369 F.3d 1024, 1026 (8th Cir. 2004). ("Withdrawal of consent need not be effectuated through particular 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement.").

**III.   Conclusion**

On March 30, 2015, following a permissible, consensual initial encounter, Corporal Craig had reasonable suspicion to begin a search of Leon's vehicle. Following a brief, *de minimis* delay, a drug dog sniff provided probable cause to continue the search. However, without this reasonable suspicion and probable cause, Leon gave voluntary consent to Corporal Craig, and the subsequent search of the trailer, which revealed approximately 270 pounds of methamphetamine, did not exceed the scope of that voluntary consent. For all these reasons, the United States respectfully requests that this Court deny the defendant's Motion.

CHRISTOPHER R. THYER
United States Attorney

*/s/ Chris Givens*

By CHRIS GIVENS
Bar No. 2009194
Assistant U. S. Attorney
P. O. Box 1229
Little Rock, AR    72203
501-340-2619
Chris.Givens@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of January, 2017, that I filed the foregoing with the district court's electronic filing system and same will forward a copy to the defendant's attorney of record.

*/s/ Chris Givens*
CHRIS GIVENS
Assistant U. S. Attorney

14