```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
 2                      WESTERN DIVISION

 3   UNITED STATES OF AMERICA,

 4                   Plaintiff,

 5    v.                             No. 4:15CR00142 JM

 6                                   January 24, 2017
                                     Little Rock, Arkansas
 7                                   1:30 PM
     JAVIER LEON,
 8
                     Defendant.
 9

10              TRANSCRIPT OF SUPPRESSION HEARING
           BEFORE THE HONORABLE JAMES M. MOODY, JR.,
11                UNITED STATES DISTRICT JUDGE

12              _____

13   APPEARANCES:

14   On Behalf of the Government:

15       CHRIS GIVENS, Assistant U.S. Attorney
           U.S. Attorney's Office
16         425 West Capitol Avenue, Suite 500
           Post Office Box 1229
17         Little Rock, Arkansas  72201-1229

18

19   On Behalf of the Defendant:

20       WILLIAM OWEN JAMES, JR., Attorney at Law
         MIKE KAISER, Attorney at Law
21         James Law Firm
           1821 South Broadway
22         Little Rock, Arkansas  72206

23       Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
24   transcription.

25
```

Karen Baker, RMR, CRR, CCR
United States Court Reporter

```
                              INDEX
WITNESSES FOR THE GOVERNMENT:  Direct  Cross  Redirect  Recross
Olen Craig                        7     22      59
Chase Melder                     63     73      84
Scott Cunningham                 85     92     101


WITNESS FOR THE DEFENSE:
Javier Leon                     104    105


EXHIBITS:                                            RECEIVED
Court's Exhibit 1.......................................21
Government's Exhibit 2..................................69
```

P R O C E E D I N G S

1

2       (Proceedings commencing in open court at 1:30 PM.)

3           THE COURT:  Good afternoon.  We are on the record in

4   Case 4:15CR142, the United States versus Javier Leon.

5   Mr. Chris Givens is here.  I thought Mr. McCree might be here

6   with you.  And Bill James, and, Mr. Mangiapane, that's not you.

7           MR. JAMES:  I'm sorry, Your Honor, this is Mike

8   Kaiser.

9           THE COURT:  Mike Kaiser.

10          MR. KAISER:  Yes, sir.  It's K-a-i-s-e-r.

11          THE COURT:  Welcome, Mr. Kaiser.  Do we need to

12  swear the interpreter?

13      (Interpreter sworn).

14          THE COURT:  Mr. Leon, if at any time during these

15  proceedings we're going too fast or you don't understand what's

16  going on, can you interrupt us?

17          THE DEFENDANT:  Okay.

18          THE COURT:  I will assume that if you don't

19  interrupt us that you understand these proceedings.  Fair

20  enough?

21          THE DEFENDANT:  I understand, but not everything.

22          THE COURT:  Well, I'm going to ask you that if you

23  don't understand what is being said here today, meaning that

24  you don't understand the interpretation between English and

25  Spanish, that you interrupt us.  Otherwise, I'm going to assume

1   you understand.  Fair enough?

2            THE DEFENDANT:  Uh-huh, that's fine.

3            THE COURT:  All right.  I have read the motion to

4   suppress, which is document 26, as well as the United States's

5   response, which was document 31, and then the defendant's reply

6   which was the response to the response, which is document

7   number 32.  Does anybody wish to give any preparatory

8   statements before we get into the testimony based on my review

9   of those three documents?

10            MR. JAMES:  Your Honor, I do have one issue.  I

11  learned today for the first time, and I think the prosecution

12  may have had a conversation with Lee Short when he was with my

13  office indicating that there was a statement attributed to my

14  client.  I figured it out today from the response of the

15  prosecution indicating there was one, and I don't know --

16            THE COURT:  You talking about the roughly 60 minute

17  interview?  Is that the statement you're talking about?

18            MR. JAMES:  Yes, Your Honor.  So it may come that we

19  need to file a motion to suppress the statement at a later

20  date.  I was just going to say that I would have no problem if

21  we have to do that because I didn't get it filed at the same

22  time, I have no problem with any of this testimony being made

23  part of that record for purposes of probable cause and that

24  type of issue being dealt with.

25            THE COURT:  Okay.

1           MR. JAMES:  I just thought I'd throw that out now.

2           MR. GIVENS:  If it comes time, the DEA office agent

3    who conducted that interview is here and can testify.  And so

4    any questions that want to be asked about that statement, I

5    have no problem with that, and I can ask questions to help

6    establish that statement, the foundation for that statement as

7    well.

8           THE COURT:  I think I understood Mr. James saying

9    that at least for now he doesn't have any objection to anything

10   that's being used in this hearing being used in perhaps a

11   subsequent hearing so we wouldn't have to go over it all again.

12   Is that a fair summary?

13          MR. JAMES:  Yes, Your Honor, that's fine.  And, of

14   course, if he wants to put that other evidence on, that may

15   resolve the issue for us once and for all, but that's exactly

16   what I was saying, Your Honor.

17          MR. GIVENS:  Your Honor, I believe we'll kind of get

18   to this when we sum everything up, but there are multiple

19   issues in this suppression hearing to address, and the United

20   States' position is that this search is lawful and legal under

21   the Fourth Amendment for a variety of reasons, and I'll touch

22   on all of them.  But essentially there was reasonable suspicion

23   regardless of any consent issues.  Absent reasonable suspicion,

24   there was probable cause based on the dog sniff, and any delay

25   between the end of the traffic stop and the dog sniff was *de*

1    *minimis* under the existing law at the time so, therefore, even

2    if there wasn't reasonable suspicion, even if there wasn't

3    valid consent, there was probable cause based on the dog sniff

4    that would make the subsequent search legal.

5              Third prong, of course, is there was valid consent.  So

6    even if there wasn't reasonable suspicion, again, there was

7    valid consent.  And, Your Honor, a fourth point that, and

8    again, this is an alternative argument, I do not submit this

9    happened, but if the Court finds that there was no reasonable

10   suspicion, it wasn't a *de minimis* delay, meaning that it was an

11   illegal detention, valid consent under certain factors does

12   cure any taint of an illegal detention, and that occurred in

13   this case.  So there are many reasons why this search was

14   legal.  I believe that we'll call on the fact witnesses to

15   testify about those reasons because, as the Court knows, any

16   time you're talking about reasonable suspicion and this type of

17   a stop, it is a fact-specific, fact-intensive question

18   depending upon the totality of the circumstances.

19             So I think the Court understanding exactly what happened

20   from start to finish of really what was a brief encounter on

21   the side of the road would be helpful and necessary in this

22   case.

23                  THE COURT:  All right.  Do you have anything to add

24   before we call our first witness?

25                  MR. JAMES:  Your Honor, I don't think we have

1    anything to add that's not already in our motion.

2              THE COURT:  All right.  Call your first.

3              MR. GIVENS:  We would call Retired Senior Corporal

4    Olen Craig of the state police.

5              MR. JAMES:  We'd ask for the rule, please.

6              THE COURT:  Anybody that you anticipate testifying

7    in the matter needs to --

8              MR. GIVENS:  We'll have three witnesses, and one is

9    the case agent, DEA Special Agent Scott Cunningham, and I'll

10   ask that he remain at the table as the case agent.  But Senior

11   Corporal Chase Melder is also testifying.  He would be subject

12   to the rule.

13             THE COURT:  Tell him there's a room just outside the

14   door there.

15        Raise your right hand.

16             **OLEN CRAIG, GOVERNMENT'S WITNESS, DULY SWORN**

17                        DIRECT EXAMINATION

18   BY MR. GIVENS:

19   Q    Sir, please state your name for the Court.

20   A    Olen Craig.

21   Q    What are you currently employed in, if anything?

22   A    Drive a truck a couple days week, but I'm retired from

23   the Arkansas State Police.

24   Q    What kind of trucks do you drive?

25   A    Just over the road 18-wheeler type.

Craig - Direct                                                    8

1    Q      How long have you been a truck driver?

2    A      About 32 years.

3    Q      Safe to say you're familiar with the type of

4    documentation and paperwork that truck drivers are required to

5    fill out?

6    A      Yes, sir.

7    Q      Before you retired, how long had you been involved with

8    law enforcement?

9    A      A little over 40 years.

10   Q      And what did the remaining good chunk of your law

11   enforcement career entail?

12   A      Most of it was spent working the Arkansas State Police

13   highway patrol.

14   Q      When did you retire?

15   A      In June of '15.

16   Q      June 2015?

17   A      Yeah.

18   Q      The incident we're here to talk about occurred in March

19   of 2015.  What was your position in March of 2015?

20   A      Senior corporal, highway patrol.

21   Q      Where are the areas that you patrolled?

22   A      We would work various areas of the state, but for the

23   main part working Fort Smith area.  But we would also work in

24   other areas, no specific.

25   Q      Did you work drug interdiction at times?

Craig - Direct

1   A      Yes.

2   Q      And when I asked you this earlier you kind of chuckled,

3   but approximately about how many traffic stops or citizen

4   encounters have you had in your career?

5   A      Thousands.

6   Q      And have a lot of those involved illegal drugs?

7   A      Yes.

8   Q      Is it safe to say that hundreds, if not thousands, of

9   times you've questioned people about drugs in their vehicles?

10  A      Yes.

11  Q      I want you to turn specifically to an encounter you had

12  on March 30th of 2015.  Did you come into contact with the

13  defendant, Javier Leon?

14  A      Yes, I did.

15  Q      And where were you when you first had contact with

16  Mr. Leon?

17  A      I was -- he was parked along on the shoulder entrance

18  ramp from Kerr Road onto I-40 east, Lonoke County.

19  Q      Are cars permitted to park on that onramp there?

20  A      There's a law that no parking on the state highway right

21  of way.

22  Q      Why did you pull over to talk to him initially?

23  A      I was just doing a welfare check.  I saw the vehicle

24  sitting there and that's just not common for anyone to be

25  sitting there unless there is a problem of some sort, and I

Craig - Direct

1    just pulled in front of him and walked back and saw that he was

2    sitting in the truck and made conversation with him.

3    Q    If there is no emergency, could that be a violation of

4    law, to be parked there?

5    A    Yes, it's probably not one of the more serious ones, but

6    yes, it is.

7    Q    Where did you pull over?  Were you in front of him?

8    A    I pulled in front of him, yes.

9    Q    What did you do after you got of your vehicle?  Please

10   tell the Court about your initial contact with Mr. Leon.

11   A    Walked back and saw he was sitting in the cab of the

12   vehicle.  I walked back and made contact with him and started

13   talking with him.

14   Q    We're going to dive into this a little bit more in a

15   moment, but what language did you speak with him initially?

16   A    English.

17   Q    Did he answer your questions?

18   A    Yes.

19   Q    Did he initiate conversation with you?

20   A    Yes.  Matter of fact, he brought up the part about -- I'm

21   not the one that brought it up, he's the one that brought it up

22   about his being parked there and he asked me if it was okay to

23   park there in an emergency and I said, yes, it is, and asked

24   him if he was having an emergency and he told me that he

25   wasn't.

Craig - Direct

1    Q      Did you have any trouble understanding him?

2    A      No.

3    Q      Did he ever tell you that he had trouble understanding

4    you?

5    A      No.

6    Q      Did he ever ask to speak to you in Spanish or to speak to

7    an officer in Spanish?

8    A      No.

9    Q      You said was the initial contact him talking about him

10   getting pulled over?

11   A      Well, he was the one that started talking about that.  I

12   was just more or less was he okay and that sort of thing,

13   checking to see some plausible reason as to why he was there.

14   Q      Did he tell you why he pulled over?

15   A      He told me that he had to call his dispatch.

16   Q      Did you notice anything unusual about the conversation at

17   this point?

18   A      Just that he kept wanting to talk about his being parked

19   there and I was not making a big deal of it.

20   Q      Now, have you encountered motorists who have been nervous

21   talking to you before?

22   A      Certainly.

23   Q      And is it fair to say that sometimes motorists are

24   nervous talking to police?

25   A      Yes, sir.

```
 1    Q     Did this encounter with Mr. Leon go beyond the realm of
 2    your experience of a normal level of nervousness?
 3    A     Yes, it did, and it seemed to be more so when I asked
 4    about if he had anything in the vehicle.  And that really
 5    seemed to key his nervousness and when I mentioned specific
 6    drugs, his response was really way beyond the normal.
 7    Q     Okay.  Did you ask him about his route or his
 8    recordkeeping?
 9    A     I asked him if he would show me his bill of lading and
10    also his logbook.  He gave me each one of those and I looked at
11    them.  Made the observation that according to his logbook, he
12    had been off duty for approximately two weeks which is quite a
13    long time for a truck driver to be just sitting and then pick
14    up a load and then not leave for two days from the time you
15    pick up a load.  There were just abnormalities in that.  That's
16    just not consistent with what a truck driver does.
17          MR. JAMES:  Objection to what's consistent.  There's
18    no basis for that.
19          MR. GIVENS:  Your Honor, he's been a truck driver
20    for 30 years and he's already testified that he keeps records
21    and he is very familiar with these types of records that must
22    be kept.
23          THE COURT:  Overruled as to that.
24    BY MR. GIVENS:
25    Q     After you examined his logbook, noticed the discrepancies
```

1    you mentioned, did you ask him about if there was anything

2    illegal in his truck?

3    A    I asked him specifically if there was anything illegal in

4    the vehicle, observed his response, and then asked for specific

5    drugs, one at a time.

6    Q    When you first asked about if there's anything illegal,

7    what was his demeanor like at that time?

8    A    He just acted like the question itself just made him

9    uncomfortable, but when I mentioned marijuana, methamphetamine,

10   cocaine, heroin, he held his hands straight up and shook his

11   head back and forth saying no, no several times.  Just way

12   beyond the norm for a response.

13   Q    And your experience in asking that same question to other

14   motorists, is that the typical kind of response that you get?

15   A    That is not typical.

16   Q    Did that raise your concern at that point when you saw

17   that reaction?

18   A    It did.

19   Q    At this point, did you display any kind of a weapon to

20   him?

21   A    No.

22   Q    And I'm having to lean in a little bit because you're a

23   bit soft spoken and have an understated demeanor.  Is this the

24   way you were talking to him at the time?

25   A    Yes.

Craig - Direct

1   Q      Did you raise your voice to him?

2   A      No.

3   Q      At any point did you make any threats?

4   A      No.

5   Q      Was there anybody with you?

6   A      I had a rider from the Memphis Drug Task Force that was

7   riding with me, yes.

8   Q      Did he participate in any way in your interaction with

9   Mr. Leon?

10  A      No.  I think he was probably still sitting in my car at

11  that time.

12  Q      Was your vehicle the only vehicle on the scene at this

13  point?

14  A      Other than Mr --

15  Q      Leon's?

16  A      Leon's.

17  Q      Was your vehicle the only law enforcement vehicle?

18  A      Yes.

19  Q      After you described his response to your question about

20  the drugs, what did you do next?

21  A      I asked him if I could search the vehicle to make sure

22  there wasn't anything illegal in it.

23  Q      What was his response?

24  A      He told me that I could, and I told him that he had the

25  right to tell me no and asked him if it was still okay for me

Craig - Direct

1    to search the vehicle.

2    Q    When you asked him the second time, what did he say?

3    A    Still told me it was okay.

4    Q    Was he under arrest at this point?

5    A    No.

6    Q    I know you told him that he was free to say no, but was

7    he, at this point, not knowing what would happen in the future,

8    was anything preventing him from leaving at this point?

9    A    No.

10   Q    Now, again, we talked about this a moment ago but during

11   this whole time you're talking with him, at any point did he

12   ask you to clarify what you were saying or did he explain to

13   you he didn't understand what you were talking about?

14   A    No.

15   Q    Do you recall approximately what time you approached

16   Mr. Leon?

17   A    It was about 4:00 p.m.

18   Q    And how long were you talking with him about the logbook

19   and illegal transportation of drugs or anything like that

20   before you asked for consent?

21   A    Just a few minutes.

22   Q    This might seem like a silly question, but did you

23   realize he was an adult at the time?

24   A    Did I realize --

25   Q    Did you realize Mr. Leon was an adult, he was a

Craig - Direct

1   53-year-old man?

2   A     Yes.  He was not too far from my age.

3   Q     Did he appear to be under the influence of anything?

4   A     No.

5   Q     Okay.  After you asked for his consent the second time

6   and he gave it again, what did you do next?

7   A     I asked him to get out of the vehicle and I looked in the

8   vehicle sleeper area and just made a quick look for other

9   people that might have been in the vehicle or weapons or any

10  noticeable large containers.

11  Q     Was anything out of the ordinary at that time?

12  A     I didn't spend a lot of time, but no, I didn't see

13  anything, and then I moved to the back of the truck which I

14  found to be locked with a padlock, big padlock on the door.

15  And at that point I asked him if he would open one door and he

16  complied.

17  Q     After you asked him, did he get out his key and open the

18  padlock?

19  A     Yes, he took a key and opened the lock.

20  Q     And, again, you didn't have to repeat yourself, you

21  didn't have to show him opening the lock, he understood your

22  verbal commands to open the door?

23  A     Yes.

24  Q     What happened when you opened the door, what did you see?

25  A     It was loaded with what appeared to be furniture.  He had

Craig - Direct

1    told me -- matter of fact, he told me he owned the furniture

2    store that he had loaded it at and he had 20 drops of furniture

3    on there and it was loaded to the back almost to the small

4    space at the top, but heavily loaded with furniture.

5    Q    And you say he's the one that told you he had 20 drops of

6    furniture to make?

7    A    Yes.

8    Q    Was there any way that you were going to be able to

9    physically climb inside that trailer and look for anything?

10   A    Not me.

11   Q    Did you believe when you saw that furniture that the

12   search was over?

13   A    No.  I felt like the most intelligent thing for me to do

14   since I had already been talking to Chase, the state police

15   officer, and knew he was in close proximity, that I would call

16   him and have him run his dog on it, so I did.

17   Q    Corporal Craig, what was your intent in asking this?

18   What were you looking for when you opened the back door to

19   search?  What was the object of your search going to be?

20   A    Drugs.

21   Q    Were you looking to see if there was furniture in there?

22   A    Well --

23   Q    Was the purpose to find out if he had furniture or was

24   the purpose to find out if he had drugs?

25   A    I was searching to see if there was anything illegal in

1  the vehicle.

2  Q      And prior to opening that back door, had you asked him

3  about illegal drugs?

4  A      Yes, sir.

5  Q      This time question is going to come up again because it's

6  important, but you told the Court that approximately three or

7  four minutes passed from the time you initially stopped to when

8  you asked for his consent to search?

9  A      Be about right.

10 Q      How long did it take you to look your brief look in the

11 cab and then get the back of the door opened?

12 A      Just a few minutes maybe, six or eight minutes maybe.

13 Q      You said that you couldn't look in.  What did you do as

14 soon as you saw that furniture?

15 A      Well, I recognized real quick that I wouldn't have been

16 able because of my age, been able to actually climb in the

17 vehicle and search it.  I felt like the best thing to do was to

18 take a dog and run the dog around it.

19 Q      Did you know if there was a dog nearby?

20 A      Yes.

21 Q      Why did you know that?

22 A      I had been talking to Chase Melder and knew that he was

23 in the close proximity.

24 Q      Is Chase Melder a corporal at the state police, K-9

25 handler?

1   A      He is.  I don't know if he's corporal or not, but he's a

2   trooper on the highway, a K-9 handler.

3   Q      Did you then call him?

4   A      Yes.

5   Q      How quickly did he arrive after you called him?

6   A      Just real shortly, just a few minutes.

7   Q      At this point, had you placed -- prior to that drug dog

8   arriving, had you placed Mr. Leon under arrest?

9   A      No, sir.

10  Q      Was he in the back of your police car handcuffed at this

11  point?

12  A      No, sir.

13  Q      Do you remember about where he was standing?

14  A      I think he was still in proximity of my car in front of

15  his truck.

16  Q      Could he have called for you at any point if he wanted

17  to?

18  A      Could he?

19  Q      Was he free to walk over and talk to you if need be?

20  A      Yes.  He could have done what he wanted, I suppose.

21  There was no issue.  I hadn't confined him.

22  Q      After Trooper Melder arrived, I'm not going to ask you

23  about dogs alerting, I know that's not your area of expertise,

24  but after you learned about the presence of methamphetamine in

25  the trailer, did you then put Mr. Leon under arrest?

Craig - Direct

```
 1   A     I don't think so.  I think I actually had the guy that
 2   was riding with me simply watch him to make sure he didn't run
 3   off.
 4   Q     When did Mr. Leon get placed under arrest?
 5   A     When Chase told me that he had actually made contact,
 6   visual contact, with the narcotics.
 7   Q     Okay.  So not when the dog alerted but when Trooper
 8   Melder actually saw the narcotics?
 9   A     Yes.
10   Q     And at that point was he placed under arrest?
11   A     Yes, sir.
12   Q     I know that this isn't -- we don't have exact time, but
13   if you could approximate about how much time passed from when
14   you first pulled your car over on the side of the road to when
15   Mr. Leon was placed under arrest, about how much time elapsed?
16   A     I would say less than 15 minutes.
17         MR. GIVENS:  Your Honor, I want to clarify.  I
18   believe this is already in the record.  This was attached as
19   Defendant's Exhibit B in their motion to suppress, and I didn't
20   know if the Court would like me to make this an exhibit.
21         THE COURT:  Exhibit B to your response?
22         MR. GIVENS:  No, Your Honor.  Exhibit B as in boy in
23   the defendant's motion to suppress, the initial motion.
24         THE COURT:  Lonoke County Arrest Disposition Report?
25         MR. GIVENS:  Yes, Your Honor.
```

```
1         THE COURT:  All right.

2         MR. GIVENS:  And I don't know if this is in the

3   record.  I can ask Corporal Craig about this or if you'd like

4   me to admit this into evidence for this hearing.

5         THE COURT:  Is there any objection to its admission?

6         MR. JAMES:  No objection, Your Honor.

7         THE COURT:  I'll receive it as Court's 1.

8      (Court's Exhibit 1 received in evidence.)

9         MR. GIVENS:  May I approach?

10        THE COURT:  Sure.

11  BY MR. GIVENS:

12  Q    Corporal Craig, I just handed you what's marked and

13  admitted as Court's 1.  Do you recognize documents like that?

14  A    It's a Lonoke County Arrest Disposition Report.

15  Q    Did you fill out that arrest and disposition report?

16  A    No, sir.

17  Q    Is that your handwriting?

18  A    No, sir.

19  Q    Is the time of arrest listed on there?

20  A    It shows 1530.

21  Q    Did you write that time down?

22  A    No, sir.

23  Q    Is that an accurate time?

24  A    No, sir.  I've got my incident report.  It would have

25  been about 4:00 p.m.
```

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Craig - Cross

1           MR. GIVENS:  Your Honor, I'll pass the witness at

2    this time.

3                          CROSS-EXAMINATION

4    BY MR. JAMES:

5    Q      You go by Mr. Craig now?

6    A      Yes, sir, that's fine.

7    Q      That's what we'll refer to you as?

8    A      That's fine.

9    Q      So let me first ask you, you said who was in the car with

10   you?  Was it DEA?

11   A      No.  He worked for the drug task force in Memphis,

12   Tennessee.

13   Q      Was he a U.S. agent?

14   A      No, sir.

15   Q      Was he from Memphis?

16   A      Yes, sir.

17   Q      So it wasn't an Arkansas --

18   A      No, sir.

19   Q      What law enforcement agency was he with?

20   A      I think just called drug task force, Memphis.

21   Q      I guess the question is, how did he end up in your car?

22   A      He was assigned by my supervisor to ride.  I mean, they

23   were doing observation.  There were more than one of their

24   officers riding with our officers at that time.

25           THE COURT:  Mr. Craig, I think he's trying to figure

Craig - Cross

```
 1   out was he Tennessee state police, was he Memphis PD.  Where
 2   did he come from if you know?
 3              THE WITNESS:  Other than drug task force, I don't
 4   know.
 5   BY MR. JAMES:
 6   Q    Okay.  You would agree with me there's nothing in the
 7   records at least that I received that indicated you had anyone
 8   else with you?  Does his name appear on anything?
 9   A    Other than my personal number and notes, I don't see it
10   on anything.
11   Q    Do you have your personal notes with you?
12   A    Yes, sir.
13   Q    May I see those?
14   A    Certainly.
15              MR. JAMES:  May I approach, Your Honor?
16              THE COURT:  Sure.
17              THE WITNESS:  Don't ask me what all of them mean
18   because some of them got some unrelated information, but that's
19   everything that I have.
20              MR. JAMES:  May I have just one minute, Your Honor?
21              THE COURT:  Sure.
22              MR. JAMES:  Thank you, Your Honor.
23              THE COURT:  Sure.
24   BY MR. JAMES:
25   Q    Mr. Craig, what are these notes from?
```

Craig - Cross

```
 1   A    That would have been from the stop just prior to my, or
 2   prior to my doing the incident report.
 3   Q    And --
 4   A    May have been some notes that were added -- I'm not
 5   looking at them right now, but it may have been something added
 6   after that for maybe an officer's name, but I couldn't say
 7   without looking at it.
 8   Q    I'm sorry, when did you do the incident report?
 9   A    Going to say it would have probably been later that
10   night.
11   Q    So these notes are not contemporaneous with the stop and
12   what's going on, at the same time?
13   A    Well, I'm not sure what you're asking me.
14   Q    Well, I'm asking, you didn't do these notes as things
15   occurred?
16   A    No, sir.
17   Q    Got something here, Scott Russell, ASP CID.  Talked to
18   him about another case?
19   A    Yeah, I think that was something unrelated to this one.
20   I don't know what that was about.
21   Q    Brent Hill is the individual that was with you; is that
22   correct?
23   A    That's the one that was with Memphis.
24   Q    Memphis?
25   A    Uh-huh.
```

Craig - Cross

1   Q      Okay.  But when you say Memphis DTF, you don't know

2   exactly who he was assigned to?

3   A      No, sir.

4   Q      So this leads to it says here you pulled in front of the

5   truck, you pulled in front of the truck on the shoulder and you

6   went to talk to him.  So there's no camera?

7   A      Correct.

8   Q      And my understanding is the only thing that's filmed of

9   this is standing around waiting for the dog maybe and then the

10  dog showing up.  Is that about right?

11  A      The dog -- when the dog come up to the rear, I think

12  there was a camera on for the dog K-9 sniff.

13  Q      Is that the K-9 handler's car that's filming that?

14  A      Yes.

15  Q      So you don't have any film or recording of any of this?

16  A      That's correct.

17  Q      And that is because it's a welfare check?

18  A      Yes, sir.

19  Q      And how is that different?

20  A      It's just not a traffic stop.  I wasn't pursuing this or

21  initiating a traffic stop.  I was just checking his welfare,

22  end of story.

23  Q      You were initiating contact with him.

24  A      But I don't have to record every time I talk to somebody.

25  Q      So when did -- so did you start recording then when you

Craig - Cross

```
1    decided it was time to search the truck because of how he was

2    acting?

3    A    No, sir.

4    Q    Why not?

5    A    I parked in front of him.  It would have been making a

6    video from -- it wouldn't have been us anyway.  It was still

7    not a traffic stop.

8    Q    Do you have a body mic?

9    A    Yes, sir.

10   Q    Was that on?

11   A    No, sir.  It comes on if the recorder comes on.

12   Q    So even if it wasn't recording what was going on as far

13   as video, we would have an audio recording of this and so we'd

14   hear all this nervousness and his going back to pulling off on

15   the side of the road and all these things you've described,

16   we'd have record of that, right?

17   A    I do not know.

18   Q    I mean, if you --

19   A    A lot of times when I'm that far away from the car, it

20   doesn't pick up anyway, so I couldn't tell you.  They've got a

21   newer system now that works a little better, but many of truck

22   stops that I've been on that you couldn't hear anything.

23   Q    So you just don't try?

24   A    It wasn't a traffic stop, so I didn't turn it on.

25            MR. JAMES:  May I approach, Your Honor?
```

Craig - Cross

1          THE COURT:  Sure.  You don't have to ask, but thank

2     you for asking anyway.

3     BY MR. JAMES:

4     Q     This right here on these notes, it says there's no

5     parking on the ramp, question.  I assume you're saying --

6     A     I don't know if I was thinking about going back and

7     checking to see if there was a sign, but I didn't.  Really kind

8     of a moot point.  I didn't arrest him for it.

9     Q     You just said you had a legal reason to --

10    A     If I wouldn't have wanted to pursue that, that would have

11    been a legal reason with or without the sign.

12    Q     He knew because of conversation, and then the word

13    "assume" with a question mark is written there.  What's that

14    mean?

15    A     Beg pardon?

16    Q     It says, There was a parking spot -- There was a no

17    parking sign on the ramp, question mark.  He knew, underlined,

18    because of --

19          MR. GIVENS:  Your Honor, I've let it go.  I'm going

20    to object to any further questions about his handwritten notes.

21    The trooper is here to testify directly.  We don't need to go

22    back and rehash his notes when he's here to answer questions

23    directly.  These notes aren't really even discoverable.  I

24    allowed him to go on because he asked nicely, but at this point

25    we're asking about interpreting the notes when he has the live

Craig - Cross

1  witness here to ask questions about what happened, so I would

2  object to any further questions about the notes as irrelevant.

3          THE COURT:  I'm going to overrule the objection.  He

4  said he made these notes shortly after the time the incident

5  happened, so I'm going to let him interpret what his own notes

6  are best he can.

7          MR. JAMES:  Thank you, Your Honor.  May I proceed?

8          THE COURT:  Sure.

9  BY MR. JAMES:

10  Q    So, again, we got he knew with underlined because of a

11  conversation.  And then it says underneath that, assume and a

12  question mark.  What does that mean?

13  A    I don't know.

14  Q    These notes, you're telling the Court, are done by you in

15  preparing to type up your report; is that correct?

16  A    They would have been prior to my doing the report.

17  Q    Is that the purpose for them?  What's the purpose for

18  them?

19  A    Just to keep my memory as to what was there or what I

20  wanted to try to make sure I included, but I don't have any

21  idea what the assume with a question mark means.  It could have

22  been, like I said, that was on a notebook that I had.  That

23  might have been something that was totally unrelated to this

24  stop.

25  Q    Well, how did these notes make it here for this hearing

Craig - Cross

```
 1   if you're not sure if it's even related to this stop?
 2   A     The rest of it's pretty obviously related to it, but it
 3   was in a notebook that I carried.  I put notes on that
 4   notebook, there could have been some things not related to this
 5   stop on there.  I tore them out, I put them with my report.
 6   Q     When did you do that?
 7   A     Before I retired.
 8   Q     Okay.  And you said this -- you don't think this is
 9   related to this event at all?
10   A     I'm going to say May 5th is not even my writing.
11   Q     Talking about this.
12   A     Scott Russell.
13   Q     Who else would have been writing on your notes?
14   A     Anybody with any pen while I was away, I suppose.  I
15   don't know.
16   Q     Kind of like the ADR with your name on it?
17   A     This one is the correct incident number, but I don't know
18   what the May 5th, 8:30 a.m. is.
19   Q     Actually I'm asking about the stuff on top.  You
20   indicated that didn't have anything to do with it?
21   A     I don't know whether it's got anything to do with it is
22   what I said.  I don't know if Scott Russell is involved, was
23   called, I don't know.
24   Q     So do you have problems remembering this incident?
25   A     No, sir.
```

```
1    Q     Was that gentleman involved?
2    A     This guy, I believe, was called but I don't know.  He
3    works for the state police, but I don't know --
4              THE COURT:  Sir, when you're talking about this guy
5    or this gentleman, who are you talking about?
6              THE WITNESS:  Scott Russell.
7              THE COURT:  Thank you.
8              THE WITNESS:  My belief is that he was called and I
9    don't know what his involvement was.
10   BY MR. JAMES:
11   Q     "Then sheriff came up, but he, I am sure, talked about it
12   more how I was concerned, DEA Scott Cunningham."  And they may
13   not be connected, but what does that mean?
14   A     What do you mean?
15   Q     This sentence and then underneath, the DEA Scott
16   Cunningham.
17             MR. GIVENS:  Your Honor, can I object?  I'd just
18   like to know where this, what the relevance of this to what
19   we're here for about right now.
20             THE COURT:  We don't know yet.  I think that's what
21   he's asking this officer, does this have anything to do with
22   what we're here to talk about, and he hasn't --
23             MR. GIVENS:  I believe he said, "No", so I object.
24             THE COURT:  He hasn't answered yet.  He just said
25   with regard to this phrase or question, does this have anything
```

Craig - Cross

```
 1    to do with the incident.  And he hasn't responded yet, and if
 2    he says no, we're moving on.
 3              THE WITNESS:  It came up that he was parked
 4    illegally.  I didn't bring it up, is my intention for that
 5    note.  DEA Scott Cunningham was involved, called or whatever.
 6    I don't know exactly what his involvement was.  I didn't pursue
 7    it after the drugs were found.  After he was put in jail, I
 8    didn't do any of the follow-up investigation.
 9              MR. JAMES:  Your Honor, I'm going to ask that -- can
10    I get a copy of these since he's up here reading from them?
11              MR. GIVENS:  I'd object, Your Honor.  This is not
12    part of Rule 16 discovery.
13              MR. JAMES:  It's not discovery.  He brought it up
14    here and testified from it.  That's what changes it.  If this
15    was sitting --
16              THE COURT:  I'll address whether or not you get a
17    copy of it later, but I've let you cover it with him and I
18    don't -- honestly I wasn't prepared to make a --
19              MR. JAMES:  I understand.
20              THE COURT:  -- discovery decision on Rule 16 because
21    honestly I don't know whether you're entitled to it or not, but
22    you were entitled at least in this hearing to go over it with
23    him.
24              MR. JAMES:  Then can I finish to make sure I finish
25    it?
```

Craig - Cross                                    32

```
1              THE COURT:  Read through and make sure there's
2    something relevant to this issue other than whatever notes he
3    would have made that are apparently not part of this
4    proceeding.
5    BY MR. JAMES:
6    Q     Do you know what this number is across the top here, the
7    top of the page?
8    A     It's a VIN number.
9    Q     Is it a VIN number related to this case?
10   A     I can't say that it is or isn't.  Yes, it is.  It's a VIN
11   number to the truck he was driving.
12   Q     Okay.  And the address, American West, you just copied
13   that out of the records, whatever you got from him, the bill of
14   lading or whatever?
15   A     Probably.
16   Q     Not sure?
17   A     I would have taken it from a document that I would have
18   believed to be accurate.
19   Q     So we're clear, the ADR that's up there that's Court's
20   Number 1, I think it's right there on the corner, you're saying
21   that you did not fill that out?
22   A     No, I didn't fill that out.
23   Q     Do you have any idea who did?
24   A     No.
25              THE COURT:  While we're on that, I'm digressing a
```

1   little bit, but if it's of record, it's got this guy's social

2   security number on it.  Do we want to do something about

3   pulling that?  It's your guy's social security number.

4           MR. JAMES:  I would ask that it be redacted.

5           MR. GIVENS:  I would also ask it be redacted.

6           THE COURT:  You put it in the record and it's your

7   client's, but while we're on the subject and I'm looking at

8   it --

9           MR. JAMES:  Thank you, Your Honor.

10          THE COURT:  -- I'll try to figure out a way to do

11  that in the Court's copy.

12          MR. JAMES:  Thank you, Your Honor.

13  BY MR. JAMES:

14  Q     So you don't know who filled that out?

15  A     No, sir.

16  Q     Do you know -- did you give someone in Lonoke some

17  information?  There's a lot of information on there.

18  A     Yes, sir.

19  Q     Including your name?

20  A     Yes, sir.

21  Q     So where would they have got that information?

22  A     They could have got it from other officers that become

23  involved, they could have got part of it from me, I do not

24  know.  I didn't fill it out, so don't know who did and don't

25  know where they got it.

```
 1    Q      So other officers may have just made up the time?
 2                 MR. GIVENS:  Objection, Your Honor.  Speculation.
 3                 THE COURT:  Sustained.
 4                 MR. JAMES:  I mean, if he didn't give it to him,
 5    Your Honor.
 6                 THE COURT:  He said he didn't know who did it and
 7    how they got the information.  I don't know how much more he
 8    cannot know.
 9    BY MR. JAMES:
10    Q      So when you pulled up in front of the vehicle, were your
11    lights on?
12    A      No, sir.
13    Q      And you said that -- just so we go through it, you said
14    it was just a few minutes between the time that you stopped him
15    and you were at the back of the truck?
16    A      I didn't ever stop him.
17    Q      You pulled -- I apologize.  That you stopped in front of
18    him in your police car and went back and talked to him and you
19    said it was within four minutes you had called -- you were at
20    the back of the truck?
21    A      It was a very short period of time.
22    Q      I mean, but a little more, any more specific?
23    A      Just a guess, estimate.  It's a close guess, but --
24    Q      What about the 4:00, where does that come from?
25    A      That was the best I could have for maybe looking back in
```

1   all of my resources to come up with a best time I could for the
2   stop.
3   Q     So that's a guess?
4   A     It's an estimate.
5   Q     Is the few minutes an estimate or a guess?
6   A     I didn't look at my watch, but with the calls that I
7   would have made, it's very close.  It's within a minute.
8   Q     What calls?
9   A     I would have probably used my phone.  I may have looked
10  back to see when I called Chase.  But I don't exactly know how
11  I derived that time.  It may have been -- I don't know how I
12  derived that time, but it's my best time for that stop or that
13  incident if you will.  It wasn't a stop.
14  Q     And you'd agree that there's no times, if I'm correct, on
15  those sheets you were typing -- that you were testifying from
16  or looking at during your testimony, there's no times on that?
17  A     On what?
18  Q     On those papers I was just looking at asking you
19  questions about it.
20              THE COURT:  You're referring to your notes.
21              MR. JAMES:  Thank you, Your Honor.
22              THE WITNESS:  May 5th at 8:30 a.m. but I'm positive
23  that was not correct.  4:03 p.m.
24  BY MR. JAMES:
25  Q     What's that?

Craig - Cross                                    36

1   A     In my time -- that was what I put down as about the time

2   Chase pulled up, so I knew it was just a few minutes before

3   that that this had initiated, so that's what derived me to put

4   4:00 p.m. on it.

5   Q     So you're saying that you got out of your vehicle, walked

6   back, had these conversations you described, went back to the

7   back of the truck, recognized the fact that you could not get

8   into the truck yourself, and called Chase?  That's the dog guy,

9   right?

10  A     Uh-huh.

11  Q     And he was there within three minutes?  All that happened

12  in a three-minute span?

13  A     About the time.

14  Q     What's about the time?

15  A     That's about the time.

16  Q     I mean, these notes say 4:03.  Correct?

17  A     It says 4:03 is about the time Chase got to me over at

18  the truck talking to him.

19  Q     And you used those notes to create this report, right,

20  your incident report, correct?

21            THE COURT:  Which incident report?

22            MR. JAMES:  The Arkansas uniform incident report.

23            THE COURT:  I don't have that.

24            THE WITNESS:  Part of it, yes.

25  BY MR. JAMES:

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Craig - Cross                                         37

1   Q     But that's -- my understanding from your testimony was

2   that's exactly why you had those notes because you wanted to

3   keep yourself straight when you did your report, correct?

4   A     Yes.

5   Q     So if 4:03 is when Chase arrives with the dog, how is it

6   that you came up with the estimate of 4:00 on your incident

7   report as the time of the stop or time of the incident?

8   A     The incident -- the incident.  I didn't make a stop.

9   Q     Incident time 4:00, how did you derive that from your own

10  notes that said it was 4:03 by the time Chase got there?

11  A     This was going on at 4:00.

12  Q     I mean, I understand it was going on at 4:00.  I think

13  the question is when did it start, not when was it going on.

14  A     It would have been just a few minutes prior to that, but

15  there's nothing wrong with saying it was at 4:00.

16  Q     I mean, do you recognize the issue of the length of stops

17  and your ability to do that pursuant to the law?  Is that

18  something --

19  A     There was no stop made.  So I understand what you're

20  trying to get at, but there was no stop made.

21  Q     Just say hypothetically if there was a stop, you are

22  aware there's issues that come up with the length of the stop,

23  correct?

24  A     Certainly.

25  Q     And so it would certainly be in your favor, it would be

1  to your benefit to preserve your case in order to tighten the

2  time as much as you can, correct?

3  A    What's the question?

4  Q    It would be in your favor -- if you could say 4:00,

5  that's better for you than before 4, isn't it?

6          MR. GIVENS:  Objection, Your Honor.  Better in --

7  the length of stop does not matter if there's reasonable

8  suspicion for one thing.

9          THE COURT:  I'm going to sustain the objection

10 because I can make that determination without him answering the

11 question, whether or not it's better or worse for his position.

12         MR. JAMES:  If the Court understands my point, I

13 will move on.

14         THE COURT:  Thank you.  I do.  I believe I do.

15         MR. JAMES:  It sounds like at least you understand

16 the inference.

17         THE COURT:  I understand the issues as briefed by

18 you.

19 BY MR. JAMES:

20 Q    So you said that you pull him out and he cooperates

21 completely with you, correct?

22 A    Yes, sir.

23 Q    And you make quite a bit about the fact that he seemed

24 more nervous than other people, correct?

25 A    Yes.

Craig - Cross

1    Q    You've stopped thousands of people?

2    A    Yes, sir.

3    Q    There's how many million people in this country?  You

4    only have a small sample.  You agree with that?

5    A    Pardon?

6    Q    You have a small sampling of everyone in the country?

7    A    Yes, sir.

8    Q    Everyone acts different.  You agree with that?

9    A    In some ways.

10   Q    And we've got a Hispanic male from California stopped by

11   a white cop in Arkansas, right?  All that's factual.  Or not

12   stopped, talking to him, correct?

13   A    Yes, sir.

14   Q    And you said he had his hands up.  There's an hour-long

15   video where he has his hands up the whole time when he's

16   talking and he's not even talking about anything important.  So

17   you don't have any idea what he does normally when he talks, do

18   you?

19   A    No, sir.

20   Q    Based on what you testified to, you were only around him

21   for like three minutes before the dog got there?

22   A    But I have been watching him over there and he doesn't

23   have his hands up.

24   Q    Is he talking?  Have you seen him talk?

25   A    He's been talking some, yes.  I haven't noticed him doing

Craig - Cross

1    that at all.

2              THE COURT:  Let's get to the factual dispute that's

3    helpful to me.

     BY MR. JAMES:

4

5    Q     So you asked him about the drugs, and he denied those,

6    correct?

7    A     That is correct.

8    Q     The allegation is only found one kind of drug, correct?

9    There's only methamphetamine, correct?

10   A     That's all we found, yes, sir.

11   Q     So there's no marijuana?

12   A     No, sir.

13   Q     Did you ask him about marijuana?

14   A     Yes, sir.

15   Q     He acted all nervous about marijuana?

16   A     Yeah, he was nervous about the entire scenario.

17   Q     Basically his contact with you made him nervous, it

18   wasn't just the mention of methamphetamine alone?

19   A     He was nervous from the time that I initially made

20   contact with him in my opinion.

21   Q     Okay.  So you said -- let's talk about you're at the back

22   of the vehicle, you're at the back of the truck and he unlocks

23   it, correct?

24   A     Yes, sir.

25   Q     Voluntarily?

Craig - Cross                                    41

1    A      Yes, sir.

2    Q      And then you decide you can't crawl in there, right?

3    A      Okay.

4    Q      Is that correct from the timeline?

5    A      Yes, sir.

6    Q      Okay.  So tell me then how he gets from the back of the

7    truck to sitting by your car in front of the truck?

8    A      I guess he walked.

9    Q      Did he just turn around and walk off and decide that was

10   a good place to sit?

11   A      I don't know.

12   Q      Did you direct him there?

13   A      I do not know.

14   Q      If he would have just turned his back on you and walked

15   to your car, would that have been something that would have

16   been not ordinary?  Did you have a lot of people turn their

17   back on you and walk and sit by your car while you were

18   searching their vehicles?

19   A      The question I'm not sure what you're asking me.

20   Q      I'm asking you if it's ordinary for someone to be

21   standing at the back of their semi when you're looking in it

22   and then just turn their back on you and walk off and go stand

23   by your car without any prodding from you?

24   A      No, I may have told him he could go stand by my car.  I

25   don't know how he got there, but I didn't have him under

Craig - Cross

1    arrest.

2    Q    Is it safe to assume you told him to stand there?

3    A    No.

4    Q    Then how did he get there?  Because you can remember

5    everything else, tell us how he got there if you didn't tell

6    him to get there.

7    A    He walked.

8    Q    And at your direction?

9    A    I don't remember.

10            MR. GIVENS:  Your Honor, asked and answered.

11            THE COURT:  Sustained.

12   BY MR. JAMES:

13   Q    So he's at the car and you don't have any idea how he got

14   there?

15   A    He walked.

16   Q    You don't know why he went there, but it wasn't --

17            MR. GIVENS:  Your Honor, objection.  Asked and

18   answered.

19            THE COURT:  Sustained.

20   BY MR. JAMES:

21   Q    So he goes there and stands and what does he do then?  So

22   you just let him walk off.  Are you watching him?

23   A    I'm assuming that the drug task force guy that was riding

24   with me was watching him as a matter of safety.  I know I

25   locked my car to keep him from driving off in it, but other

Craig - Cross

1  than that, I can't tell you.  I don't know what he was doing.

2  Q    So you didn't see -- did you see him walk to your car?

3  A    I'm just assuming that's where he was.

4  Q    So you don't even know where he was?  Because a minute

5  ago, earlier, you testified that's exactly where he was.

6  A    I'm pretty sure, but I didn't have him under arrest so I

7  couldn't tell you.

8  Q    So you don't know where he is.  That's your final answer,

9  you don't know where he is?

10  A    Not 100 percent certain where he was at.

11  Q    When did you next connect with him so you knew where he

12  was at?

13  A    I believe it was when Chase actually had got into the

14  truck, made visual contact, knew that there was narcotics in

15  the vehicle.

16  Q    So that was just a few minutes, right?

17  A    It was very short.

18  Q    Three minutes there and then a few minutes later, he's

19  been in the truck and out and said I found it?

20  A    Yeah.

21  Q    So in your testimony, we're six, eight minutes out, and

22  you haven't laid eyes on Mr. Leon for the last four or five

23  minutes?

24  A    I doubt that, but I can't tell you exactly where he was.

25  Q    So, again, then do you recall when the next time you saw

1    him was and you can recall where he was at?

2    A    I think he was up toward the front of the truck.

3    Q    Was he in front of the truck?  Was he near your car?

4    A    My car was in front of my truck.

5    Q    You said near the front of the truck.

6    A    That would have to be the same place.

7    Q    Well, you could be standing at the back wheels and be

8    near the front of the truck.  So is he between the truck and

9    your car?

10   A    I don't recall.  I don't know.  I said I didn't know.

11   Q    So there's my confusion when I'm asking you where the

12   front of the truck is because I asked you specifically where he

13   is, and you don't know.  So how do you know where he was at?

14   A    I told you, I don't know.

15   Q    Okay.  So when's the next time you have contact with him?

16   A    Are we going to a different time?

17   Q    No, we're still at the he's somewhere in the neighborhood

18   area of the front of the truck.  So when is the next time that

19   you have actual memory of having contact with him?

20   A    I arrested him when Chase found the drugs.

21   Q    Where was he when you arrested him?

22   A    He was probably in front of --

23   Q    No, no, I don't know where he probably was.

24        THE COURT:  Let him answer the question before you

25   interrupt him.  Where was he, sir?

Craig - Cross

```
1          THE WITNESS:  I think he was in front of the truck.
2   BY MR. JAMES:
3   Q     Between your car and the truck?
4   A     My car was in front of the truck.
5   Q     I understand that.  But we're playing a lot of semantic
6   games.
7   A     I don't know exactly where he was in front of the truck.
8   I can't put an exact position as to where he was between my car
9   and the truck.  That's just, I can't do that.  I can't answer
10  that question.
11  Q     If the truck rolled forward and hit the car and he didn't
12  move, would it have hit him?
13  A     I don't know.
14  Q     Okay.  So he is under arrest, by your testimony, if I'm
15  correct, in less than 15 minutes from the minute you made
16  contact with him?  That's your testimony?
17  A     That would be real close.  That's my guess, yes, sir,
18  that would be a very close estimate.
19  Q     What do you think the variance on that guess is?
20  A     Not very much.
21  Q     I don't know what that means.
22  A     Not very much.
23  Q     Five minutes, ten minutes?
24  A     It wouldn't have been that much, I don't believe.
25  Q     Those are two choices.
```

Craig - Cross

```
1   A     I don't think it would have been -- I think that's pretty
2   close.  I think that's really close.
3   Q     15 minutes?
4   A     What?
5   Q     Let me --
6   A     I don't think I was off no 15 minutes, no, sir.
7   Q     What's that?
8   A     I wasn't off 15 minutes, no, sir.
9   Q     You said --
10  A     It would have been close --
11        THE COURT:  Sir, I think he is asking you is the
12  time from the time you made contact with him till the time he
13  was arrested 15 minutes.
14        THE WITNESS:  That'd be real close, yes, sir.
15  BY MR. JAMES:
16  Q     Okay.  So let's talk a little more specific about your
17  suspicion that he appeared nervous.  He answered your questions
18  all, "No", correct, that he didn't have anything illegal,
19  correct?
20  A     That's correct.
21  Q     He cooperated with you, he gave you, provided the key and
22  opened the lock himself, correct?
23  A     Yes.
24  Q     Let me ask you this.  Did you bother to check any of his
25  other paperwork like insurance and all that before you called
```

1    in the dog?

2    A      No.

3    Q      Why not?

4    A      Didn't need to.  Didn't want to.

5    Q      What is your reasonable suspicion?  He's on the side of

6    the road on a very minor offense, if anything, by your own

7    testimony, correct?

8    A      Was no plausible explanation to me as to why he was

9    there.  His logbook showed that he had loaded two days prior.

10   Q      I'm sorry, no plausible explanation why he was parked on

11   the side of the road?

12   A      He told me he stopped to call dispatch, but he didn't

13   have a phone to his ear.

14   Q      There's a cop in front of him coming up to talk to him.

15   Do you think maybe he hung up?

16   A      I don't know.  He wasn't talking.

17   Q      Is that possible?

18   A      I didn't see a phone.  He wasn't talking to anybody.

19   Q      Did you search his truck for a phone?

20   A      I wasn't looking for a phone.

21   Q      So you think he lied about having a phone?

22   A      I don't know whether he had a phone or not.  He probably

23   did.

24   Q      So, again, you come up to him, you're talking to him, he

25   answers all your questions, cooperates with you, correct?

Craig - Cross

1    A    Yes, sir.

2    Q    So what is your reasonable suspicion that he's doing

3    something illegal?

4    A    His actions and his paperwork.

5    Q    No, no.  What actions?

6    A    His nervousness, his over-response to the questions that

7    I was asking him.

8    Q    His over-response was denying that he had anything

9    illegal?

10   A    He held his hands straight up in the air, shook his head

11   back and forth saying no, no, no.

12   Q    You're not allowed to do that?

13   A    You're allowed to do that, but it's not normal.

14   Q    Where is the appropriate place for him to have his hands

15   if he's not nervous?

16   A    That's not normal.

17   Q    When I watch police shows and the cops come up, they

18   often say, Let me see your hands.  Right?

19   A    I never asked him to show me his hands.

20   Q    I understand that, but if I've watched TV and I've seen

21   that and I want -- he's a lot less of a threat to you with his

22   hands up than hidden or down where you can't see them.  You

23   agree with that?

24   A    I agree with what you're saying, but that's not why he

25   was doing.

Craig - Cross

1   Q     Okay.  So he's got his hands up saying, I don't have
2   anything.  Right?  What else -- tell me what else he did that
3   made you think --
4   A     Shaking his head back and forth.  Those are signs of
5   overreaction.  That is just not normal with the people that
6   I've dealt with.
7   Q     In your mind.  In your --
8   A     I know.  I done it for 40 years.  I know it.
9   Q     Let's articulate what he did.  He had his hands up and
10  said, "No".  What else did he do?
11  A     He was shaking his head back and forth saying "No" more
12  than just once.
13  Q     How many times -- how many questions did you ask him?
14  A     I asked him if he had anything illegal in the vehicle, I
15  asked him if he -- and I made mention of four specific drugs.
16  Q     Okay.  Four specific drugs.  Which ones?
17  A     Marijuana, cocaine, heroin, and methamphetamine.
18  Q     So that's five times, right?  That's five "No's" right
19  there, isn't it?
20  A     Yes.
21  Q     If he answers your question at least those five
22  questions, that's five "No's."  That's repeatedly saying "No",
23  isn't it?
24  A     And more than once to each question, he said, "No."
25  Q     Okay.  So what else?  So he denied that he was doing

Craig - Cross

```
 1   anything illegal.  What else -- what other evidence did you
 2   have that he was doing something illegal?
 3   A     He had been off for two weeks.
 4   Q     Is that illegal?
 5   A     It's not normal.
 6   Q     Let me ask you, you're a truck driver?
 7   A     Uh-huh.
 8   Q     You ever got stuck on the west coast?
 9   A     No, sir.
10   Q     Never?
11   A     No, sir.
12   Q     Ever heard about people getting stuck on the west coast?
13   A lot of stuff goes to the west coast and a lot of stuff -- a
14   lot more stuff goes out than comes in sometimes.  You agree
15   with that?
16   A     A lot of --
17   Q     You ever heard of deadheading?
18   A     Yeah.
19   Q     What's deadheading?
20   A     Moving without a load.
21   Q     People ever have to do that?
22   A     Yeah.
23   Q     What if you're in your own home and waiting for a load
24   because you live nearby?
25   A     If I were there two weeks without a load, I'd take off
```

1   right then, but he waited two more days after that.

2   Q     When was he supposed to deliver?

3   A     I don't recall.

4   Q     Then, I mean, how do you know that that even means

5   anything?  Maybe he's not supposed to deliver for four days,

6   why would he want to wait somewhere for two days until they'll

7   take the load if he's just sitting at home.  You don't have any

8   idea what was wrong with that, do you?  You just don't like it.

9   A     By his response, I was pretty sure that the reason his

10  response was because he was nervous.

11  Q     What was his response?

12  A     He held his hands straight up in the air.

13  Q     Okay.  We got the hands up, head shaking.

14  A     That's what his response was.

15  Q     Said "No" four or five times.  Right?

16  A     Yes.

17  Q     So let's move on from that.  That's locked in, we got

18  that.  I want to know what else he did.  You said you didn't

19  like the fact that he'd been off for two weeks.  You want him

20  working all the time.  But why does that mean he's doing

21  something illegal?

22  A     It's just an indicator.

23  Q     Of what?

24  A     Of the possibility of illegal activity.

25  Q     Okay.  I understand possibility, but tell me what that

Craig - Cross

possibility -- I mean, he could have been hauling Hoffa's body
around, right?  That is possible that somehow he's got Hoffa's
body in the truck hauling it around, sitting at home with it,
right?  But the reality is that's not realistic.  So what
evidence is him not working for two weeks before that he's
doing something wrong?

A     That alone would have probably not been.

Q     So let's talk about the fact that he waits two days after
the truck got loaded.  How does that mean he's doing something
wrong?

A     He tells me he owns his own truck, he owns his own
company.  Why would you wait two days after you loaded a load
from your own company before you leave unless there was some
reason for that.  It's just common sense.

Q     Maybe he just didn't want to leave.  What company did he
own?

A     He told me he owned it.  I don't know.  We didn't find
that he owned a company.

Q     You found he owned the truck, right?  You found he owned
the truck, correct?

A     He told me he owned the company where he loaded at.

Q     I understand that's what you heard.  I'm asking, you
found out that he owned the truck, right?

A     I believe the truck was registered to him, I believe.
But I think he told me he owned the company.

Craig - Cross

1    Q     Well, is it possible that in all your contacts with the

2    environment, the community, and the people out there that maybe

3    you misunderstood somebody who's main language is Spanish?  Is

4    that possible?

5    A     No.  He wasn't speaking in Spanish.

6    Q     I understand that.  But he's speaking English and it's

7    not his primary language.

8          THE COURT:  Are we switching gears and talking about

9    Spanish now or are we talking about something in particular?

10         MR. JAMES:  Sir?

11         THE COURT:  I said, are we switching gears and

12   talking about the language barrier or are we talking about

13   something in particular?

14         MR. JAMES:  We're talking about the fact that he

15   says my client admitted that he owned a company that he doesn't

16   own, and it's clear that he said he owned the truck.  I'm

17   asking him if it's possible over this umbrella of all this that

18   maybe he didn't understand everything he said.

19         MR. GIVENS:  Your Honor, relevance again.  Is it

20   relevant whether he owned the company or not in the context of

21   this hearing?

22         THE COURT:  Ask your next question, Mr. James.  I'm

23   not sure we're getting very far because I'm not sure you're

24   communicating with a concise question with the witness.  Is

25   there a question whether or not there was a language barrier or

Craig - Cross

```
 1    is there a question whether or not it was later established
 2    that he owned a truck or furniture company?
 3               MR. JAMES:  My question is, does he recognize the
 4    possibility that maybe he didn't understand everything that was
 5    told to him.
 6               THE COURT:  Okay.  You can answer that question,
 7    sir.
 8               THE WITNESS:  Is it possible?  I understood
 9    everything he told me.
10    BY MR. JAMES:
11    Q    Even the part where he said he owned a furniture company?
12    A    That's what he told me.
13    Q    And if that's not true, then he either lied to you or you
14    didn't understand him?
15    A    Or he was so nervous, he just said it.
16    Q    Just admitting he owns companies because he's scared?
17    A    In my opinion, he was so nervous, he just said it.
18    Q    Who was making him nervous?
19    A    I would think I'd be nervous if I had that kind of
20    narcotics in my vehicle.
21    Q    How about -- well, let's move on from that.  So you
22    arrest him, you put cuffs on him?
23    A    Yes, sir.
24    Q    You sure?
25    A    Yes, sir.
```

Craig - Cross

1   Q      You did that?

2   A      More than likely.

3   Q      Well, the more than likely game, I'm asking if you put

4   handcuffs on him.

5   A      I'm fairly sure.

6   Q      Sir?

7   A      I'm fairly sure, but do I remember for sure whether I'm

8   the one or if I asked somebody else to, no, I don't.

9   Q      Who else would have been there that you would have asked?

10  A      By that time there could have been probably several other

11  officers there.

12  Q      Were there or were there probably?

13  A      There was Chase Melder was there and I believe he had

14  someone riding with him.

15  Q      That's the dog guy, right?

16  A      Uh-huh.

17  Q      And they're at the back of the truck, right?

18  A      Yes, sir.

19  Q      And based on our earlier conversation, Mr. Leon is

20  somewhere in the vicinity of the front of the truck, correct?

21  A      Yes, sir.

22  Q      So were there other officers up toward the vicinity of

23  the front of the truck that might have handcuffed him?

24  A      Probably not.

25  Q      So by elimination, you assumed you did it?

Craig - Cross                    56

1   A    Yes, sir.

2   Q    But I'm asking you, do you have a recollection of that

3   occurring?

4   A    No, sir.

5   Q    So do you know what happened to him after he got

6   handcuffed?

7   A    He was transported to the Lonoke County Detention Center.

8   Well, I may -- somebody else probably done that because I drove

9   the truck from there to the co-op.  I don't know whether they

10  took him there or whether they left him in my vehicle and

11  somebody else drove the vehicle.

12  Q    So you don't know what happened?

13  A    In thinking about it, I believe he stayed in the back of

14  my car for a while and then we went to the, I believe it was

15  the co-op in between Lonoke and another little town just east

16  of there, but I can't think of the name of it.

17        THE COURT:  Mr. James, how does anything after his

18  arrest affect my issue regarding the search?

19        MR. JAMES:  I think why it's important to me and

20  maybe hopefully to the Court is he can't remember anything that

21  happened except the specifics he wants to remember.  That's the

22  point.  As far as the legal issues, it doesn't really matter.

23  His credibility and his exact memory of what happens at the

24  points that he decides that he wants to remember are absolute

25  and he can't remember other big events.

Craig - Cross                                    57

1          THE COURT:  The question to the witness was after he
2   was arrested where was he taken.  And I'm going to make my own
3   objection that I don't think that's relevant.  I've given you a
4   lot of leeway, but what happened after he was arrested and
5   removed from the scene with the exception of some debate about
6   whether or not he understood English with regard to this other
7   statement, I don't find anything to be particularly insightful
8   to me to make this ruling after he was arrested.  With the
9   exception of whether or not he understood what was going on,
10  and we've talked about that, you and me have before the hearing
11  started.  This witness didn't say anything in that interview.
12  But my point being is we're past the area of inquiry.  I
13  understand you've got credibility issues and you've made those
14  one way or another, but I'm not going to find that anything
15  beyond the arrest is particularly helpful to me making this
16  decision.
17          MR. JAMES:  As the fact-finder, you make that call,
18  Your Honor.  I'll move on.
19          THE COURT:  All right.  Thank you.
20  BY MR. JAMES:
21  Q    Let me ask you, I want to back up a little bit.  You were
22  asked by the prosecutor, he never asked for someone to speak
23  Spanish.  Did he ever ask you for someone to speak Spanish?
24  A    No.
25  Q    Remember the prosecutor asked you that?  You remember

Craig - Cross                                    58

1    that?

2    A      Yeah.

3    Q      I'm just asking if you remember it.  Assuming you

4    remember that, then did you ever offer to get someone to speak

5    Spanish?

6    A      I had no reason to.

7    Q      Because you understood everything completely?

8    A      And so did he.

9    Q      How do you know that?

10   A      Because he responded with everything I said with no

11   issue.  Everything I asked, he did.

12   Q      But you can't remember if you asked him to --

13          I apologize, Your Honor.  May I have just a moment, Your

14   Honor?

15             THE COURT:  Sure.

16   BY MR. JAMES:

17   Q      I just want to -- I got off track when I was asking you

18   about the things that created in your mind reasonably something

19   illegal was happening.  I want to clarify.  When you got to the

20   back of the truck and looked in, there was nothing obviously

21   out of order?  It was a load of furniture, correct?

22   A      That's what it appeared to be.

23   Q      Was there anything that looked unusual about that?

24   A      No.

25   Q      Then with regard to the consent to search, did he give

Craig - Redirect

```
 1    you consent to search?
 2    A     Yes, sir.
 3    Q     Did you offer him a consent to search form of any kind?
 4    A     No, sir.
 5    Q     So since no, certainly didn't ask him or offer that to
 6    him in Spanish?
 7    A     No, sir.
 8    Q     By default, right?
 9    A     I didn't understand that question.
10    Q     By default, since you didn't offer him one, you certainly
11    didn't offer him one in Spanish because you didn't offer him
12    one at all?
13    A     Right.
14    Q     Your testimony is that he was not under arrest and he
15    could have left at any time prior to the dog, until you
16    actually made visual contact with what is believed to be
17    methamphetamine?
18    A     That is correct.  He was not under arrest.
19    Q     In fact, by your testimony, you don't even know where he
20    was exactly?
21    A     Not exactly.
22              MR. JAMES:  Pass the witness, Your Honor.
23                        REDIRECT EXAMINATION
24    BY MR. GIVENS:
25    Q     A couple quick ones, Trooper.  Corporal Craig, you have
```

Craig - Redirect

1   asked for verbal consent from people in the past to search
2   their vehicles?
3   A    Yes, sir.
4   Q    And was there anything different in your asking and
5   receiving consent from Mr. Leon?
6            MR. JAMES:  Relevance.
7            THE COURT:  What is the relevance?
8            MR. GIVENS:  Your Honor, they were asking about did
9   he give consent.  And the point here is that he understood that
10  he received consent.  There was no -- Mr. James made the point
11  that he didn't understand everything that was happening.  I
12  want it clear to the Court that there was unequivocal consent
13  given and that he is experienced.
14           THE COURT:  You can ask him that question as to this
15  gentleman.  I think the objection is all these other people
16  he's taken consent from.
17           MR. GIVENS:  I was just asking -- I didn't want to
18  use the word in your experience without establishing that he
19  has experience doing it.
20           THE COURT:  Let's just skip straight to the
21  question.
22           MR. GIVENS:  Yes, sir.
23  BY MR. GIVENS:
24  Q    Was there any doubt in your mind that he gave you
25  unequivocal consent?

1    A      No doubt.

2    Q      You asked two different times, correct?

3    A      Yes.

4    Q      Both times were you crystal clear that he was agreeing to

5    consent to search?

6    A      Absolutely.

7    Q      And then the last thing, I just want to concisely talk

8    about the timeline here so I'm going to break this down into

9    four sections.  About how much time passed between the time you

10   pulled your car up until the time you asked for and received

11   consent?

12   A      Maybe four minutes.  I'm just guessing.

13   Q      How much time elapsed from the time you received consent

14   until the time you called Trooper Melder for the drug dog?

15   A      Maybe three minutes.

16   Q      And then from the time you called Trooper Melder until

17   the time Trooper Melder arrived, about how much time elapsed?

18   A      Just a few minutes.  It wasn't much more than those

19   differences.

20   Q      Let's put a number, when you say a few minutes, what

21   number would you put on it?

22   A      Three or four minutes.

23   Q      Okay.  And then, finally, how much time passed from the

24   time that Trooper Melder arrived until the time the meth was

25   visually located and he was arrested?

1    A     Maybe five minutes.

2    Q     Thank you, Trooper.  I have no further witnesses.  I'm

3    sorry, I do have further witnesses.  I have no further

4    questions for this witness.

5              THE COURT:  Any recross?

6              MR. JAMES:  No, Your Honor.

7              THE COURT:  You can step down, sir.  Can we excuse

8    this gentleman from the rule or let him go, whichever?

9              MR. GIVENS:  Your Honor --

10             THE COURT:  Mr. James, do you want me to keep him

11   for any reason?

12             MR. JAMES:  No, Your Honor, he's free to go.

13             MR. GIVENS:  Your Honor, I would next call Corporal

14   Chase Melder.

15             MR. JAMES:  Your Honor, before he leaves if the

16   Court's going to make a ruling with regard to those notes or

17   maybe he needs to stay if --

18             THE COURT:  Well --

19             MR. JAMES:  They've agreed to not do anything with

20   the notes, Your Honor, until the Court decides on that so I'm

21   fine with that.

22             THE COURT:  Then I'll order that the notes be kept

23   either with the prosecution or in a place where you can get

24   access to them should I order that.  Thank you.

25          **CHASE MELDER, GOVERNMENT'S WITNESS, DULY SWORN**

Melder - Direct

```
 1                    DIRECT EXAMINATION
 2   BY MR. GIVENS:
 3   Q    Now, under oath and penalty of perjury, please tell the
 4   Court your name and where you work.
 5   A    Chase Melder, Arkansas State Police.
 6   Q    How long have you been with the state police?
 7   A    I've been with the state police for ten years.
 8   Q    What are your primary responsibilities with the police?
 9   A    Normal traffic enforcement and I'm on the interstate
10   criminal patrol team, which basically means that most of the
11   time I'm working the interstate, but I still work wrecks, do
12   motorist assists, calls for assistance, things of that nature.
13   Q    And are you a certified K-9 handler?
14   A    Yes.
15   Q    Who is your dog?
16   A    His name's Pavatt.
17   Q    How long have you and Pavatt been working together?
18   A    About four years now.
19   Q    What are some of the types of things that you and Pavatt
20   do?
21   A    A lot of things on the narcotics side.  Of course, I've
22   run him on the cars on the side of the road on the interstate,
23   on traffic stops, we go to schools and the request of schools
24   and run lockers, do parking lots at schools, look for drugs,
25   calls from assistance from various agencies.  He's also a
```

Melder - Direct

1  patrol dog handler protection dog.  He can sniff out articles

2  that may be lost or thrown into a field or somewhere that maybe

3  could be some kind of evidence, he can find that stuff.  He's a

4  tracking dog.

5  Q    Have you received training to use Pavatt for all these

6  skills?

7  A    Yes.

8  Q    Talk a little bit about your training.

9  A    Our training is we typically, as a group, as a K-9 group,

10 we typically train together once a month, but between those

11 trainings, you know, it's up to me to keep up Pavatt's

12 training.  We try to make it as realistic as possible which

13 includes hiding drugs on cars, sometimes it's by me, sometimes

14 I get people to do it for me.  That way I don't know where the

15 narcotics are.  We run a lot of clean vehicles in a controlled

16 environment so that we can show that Pavatt does not alert to

17 cars where there's not narcotic odor.

18 Q    Are both you and Pavatt required to be certified?

19 A    Yes, annually.

20 Q    And the Arkansas laws do that annually?

21 A    Yes.

22 Q    What entails the certification process?

23 A    Certification process has to do with running vehicles.  I

24 don't know exactly.

25 Q    Who does the certifying?

Melder - Direct

1    A    Roby Rhodes.  He's our K-9 coordinator.

2    Q    That is something that is done on a yearly basis?

3    A    That's right, yes.

4    Q    Do you receive notice of certification for that?

5    A    That's right, yes.

6    Q    The incident --

7              MR. JAMES:  Your Honor, I apologize.  I didn't

8    realize that the last witness is still in the courtroom.  I

9    thought he was leaving.

10             MR. GIVENS:  I thought he was released from the

11   rule.  He can step outside.

12             MR. JAMES:  I thought he was leaving.  I want him

13   under the rule.

14             THE COURT:  He isn't going to be recalled.

15             MR. JAMES:  I understand that, but I prefer him not

16   being here.  I ask that he stay under the rule if he's going to

17   remain.

18             THE COURT:  Talking about Mr. Craig?

19             MR. JAMES:  Yes, sir.  I thought that the Court said

20   can he leave.  And I thought he was leaving under the rule.

21             THE COURT:  Right.  Well, what I meant was if I

22   release him from the rule, that just means he's not going to be

23   recalled under any circumstance, and I didn't know if he was

24   going to leave or not.  But I wanted to make sure you weren't

25   going to recall him.  If you're saying you don't want him in

Melder - Direct

1    here for these proceedings for later testimony, meaning at

2    trial or something other than this, he's not going to be able

3    to be called by the prosecution in this proceeding again.  So

4    generally the rule is you don't get to hear what testimony

5    you're going to hear and go to school on it.  He's already

6    testified.  So what's your point?  He's not going to be

7    recalled in these proceedings.

8              MR. JAMES:  Well, I wouldn't have agreed to release

9    him from the rule if I thought he was going to stay in the

10   room.  The Court can take that for -- I thought he was leaving.

11   I understood the Court to say is it okay if he leaves, and I

12   thought he was leaving and so he can be under the rule while

13   he's wandering --

14             THE COURT:  The purpose, you can correct me, but the

15   purpose of the rule is that somebody doesn't inform their

16   testimony by another witness's testimony, and he's already

17   testified.  And if I release him from the rule, both sides

18   agree that they don't have a plan to call him again, at least

19   in these proceedings.  So is your objection that he may hear

20   this guy testify prior to trial?  I'm not sure I understand

21   what prejudice you're --

22             MR. JAMES:  I'm just saying that I wouldn't have

23   agreed for him to be released from the rule if I thought he was

24   staying.  The Court can do --

25             THE COURT:  Now that he is, what's your objection to

Melder - Direct

1    him staying?

2              MR. JAMES:  I don't want him in here.  That's a

3    candid answer.  I thought the Court -- I thought he was leaving

4    and so I --

5              THE COURT:  I don't think at this point of the

6    proceedings since he's not testifying again that he is

7    appropriately excluded from sitting out in the audience.

8              MR. JAMES:  And because I didn't object, I may have

9    waived --

10             THE COURT:  Because neither side indicated that he's

11   going to be recalled in these proceedings is the reason for

12   that.

13             MR. JAMES:  Again, I understand the Court's ruling.

14   Just for the record, I would not have agreed if I would have

15   known he was going to stay, and I sure have an objection to him

16   sitting at counsel table because he already has a

17   representative.

18             THE COURT:  He already has what?

19             MR. JAMES:  He already has a case agent.

20             MR. GIVENS:  He didn't know.  I agree that he cannot

21   be at the table.  That's what I was just telling him, that at

22   this point he's just a civilian, he can be in the audience but

23   not at the table and not talking to me or the case agent.

24             THE COURT:  All right.

25   BY MR. GIVENS:

Melder - Direct                                68

1    Q     We were talking about your and Pavatt's certifications.

2    A     Right.

3    Q     The incident we're here to talk about occurred on

4    March 30th of 2015.  Do you know if Pavatt and you were

5    certified at that time?

6    A     We both were.

7    Q     And when was your certification?  Was it in April?

8    A     April 2014, I think.

9              MR. JAMES:  No objection, Your Honor.

10   BY MR. GIVENS:

11   Q     Corporal Melder, I just handed you a certification and

12   ask to move it into evidence, Court's 2 or Government's 2.

13   What is that?

14   A     That is our narcotics detector dog team annual

15   certification.

16             MR. GIVENS:  Your Honor, I did not wait.  I said I

17   asked for it to be admitted and did not wait for a ruling.

18             THE COURT:  I don't have any objection.

19             MR. GIVENS:  Just showing, Your Honor, that he was

20   certified at the time of the search.

21             THE COURT:  You're going to keep this?  Any

22   objection to the --

23             MR. JAMES:  No, Your Honor.

24             THE COURT:  Defendant's 2, or Government's 2, will

25   be received.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Melder - Direct

```
 1              MR. GIVENS:  Just to show the Court that he was
 2   certified on the day of the stop.
 3          (Government's Exhibit 2 received in evidence.)
 4   BY MR. GIVENS:
 5   Q      Turning toward do you recall having contact with an
 6   18-wheeler in Lonoke County near I-40 on March 30th, 2015?
 7   A      I do.
 8   Q      Did you find out who the driver of that vehicle is?
 9   A      I know who he is.  I didn't know at the time.
10   Q      You didn't know at the time.  Was it Mr. Leon, the
11   defendant, here today?
12   A      That's correct, yes.
13   Q      Why did you come to Mr. Leon's vehicle?
14   A      I was contacted by Senior Corporal Olen Craig to come to
15   that location to deploy my K-9, Pavatt, to sniff the vehicle
16   for narcotics.
17   Q      Did he call you on your phone?
18   A      I think so, yes.
19   Q      Had you been working with Trooper Craig earlier that day?
20   Were you guys in the same area?
21   A      We were working Lonoke County at the same time, yes.
22   Q      From the time that he called you until the time you
23   arrived at Mr. Leon's vehicle, do you know about how much time
24   passed?
25   A      It was no more than five minutes.
```

Melder - Direct

1  Q     You were very close to him at the time?

2  A     I was close, yes.

3  Q     At the time you received the call?

4  A     Yes.

5  Q     Have you viewed a video -- did you take video of you

6  deploying Pavatt?

7  A     I did, yes.

8  Q     Do you recall the time on the video when you began, when

9  you deployed Pavatt?

10 A     It's 4:09 p.m.

11 Q     4:09 p.m.?

12 A     That's correct.

13 Q     And how much time would you have been on scene before you

14 deployed Pavatt, before that 4:09 time?

15 A     30 seconds, less than a minute, probably.  About a minute

16 we'll say.

17 Q     So you pulled up and immediately ran Pavatt?

18 A     Pretty close.  I talked to Senior Corporal Craig at the

19 front of my vehicle for just a brief moment before I got my dog

20 out and ran him.

21 Q     All right.  Please tell the Court about what happened

22 when you ran the dog.

23 A     I ran Pavatt, he showed a profound alert to the odor of

24 narcotics coming from the vehicle.  That took me about two

25 minutes to run the tractor trailer.  I put Pavatt up, told

Melder - Direct

1    Senior Corporal Craig that he's alerted to the odor of

2    narcotics and we proceeded with the search of the vehicle.

3    Q    You mentioned the word "profound alert".  Is that K-9

4    speak?

5    A    It is.  Profound -- three things with a dog.  You have an

6    alert, which is something that I see a change of behavior that

7    I see in my dog that someone else that don't know about my dog,

8    they can't see that.  A profound alert is an alert without an

9    indication that's a profound change in his behavior that

10   somebody that's never seen my dog before can see.  And then you

11   have an indication, which is a final response to the narcotic

12   odor.  Like for us, he's a passive alert dog or passive

13   indicating dog, so that would be sitting, lying down, standing,

14   things like that.

15   Q    Okay.  How many times did Pavatt alert on Mr. Leon's

16   trailer or how many spots?

17   A    He alerted and gave a profound alert in two areas.

18   Q    And please describe where those two areas were.

19   A    One was at the rear doors of the trailer and the other

20   one was underneath the trailer about a quarter of a way up from

21   the back of the trailer toward the cab, about a quarter of a

22   way up the trailer.

23   Q    So toward the back of the trailer?

24   A    That's correct.

25   Q    Quarter of the way up or three quarters of the way back?

Melder - Direct

1    A    That's right.

2    Q    All right.  After Pavatt had these alerts, what did you

3    do?

4    A    I put him up in the vehicle and told Corporal Craig that

5    he alerted.

6    Q    And what happened next?

7    A    Next we opened the doors, I think Corporal Craig had

8    already seen the way that the trailer was loaded, and me being

9    a little younger and more agile, he asked me to crawl up there

10   to search the vehicle or the trailer.

11   Q    And then were narcotics located around the area where

12   Pavatt alerted?

13   A    Yes, above it, yes.

14   Q    Did you have any contact with Mr. Leon during this time?

15   A    No.

16   Q    Did you see him at all?

17   A    I saw him once.  It was after we had already left and

18   went to the co-op, I think, was the only time that I remember

19   seeing him.

20   Q    I asked you how long from the time that Corporal Craig

21   called you until the time you arrived.  You stated less than

22   five minutes.  You also stated that you ran the dog about 4:09.

23   About how long total from the time you ran the dog until you

24   were able to visually see the narcotics?

25   A    From the time that I ran the dog till I saw the narcotics

1    was four or five minutes maybe.

2    Q    It didn't take you long to crawl inside there?

3    A    No.  As soon as I crawled up there, it didn't take me but

4    just a second to see it.

5              MR. GIVENS:  Your Honor, I'll pass the witness.

6                        CROSS-EXAMINATION

7    BY MR. JAMES:

8    Q    Is there a recording of all this?

9    A    Of all of what?

10   Q    That you just described.

11   A    Not all of it, sir.

12   Q    What is there a recording of?

13   A    Of me deploying my dog to sniff the tractor trailer.

14   Q    Explain this to me.  What is the significance of the dog

15   running basically from your car to the front of the truck?  Is

16   there some significance to that?

17   A    No.

18   Q    That's in your report?

19   A    I don't understand what you're asking me.  That's the way

20   that he sniffed.  We did a counter clockwise sniff from the

21   vehicle, he goes to the back and runs toward the front.  I

22   don't know specifically what you're asking me.

23   Q    I'm asking you what the significance of him running from

24   your car to the front of the truck is.  Is there any

25   significance to that?

1    A      No.

2    Q      That's just the way it's done, right?

3    A      Yes.

4    Q      And you said he's a passive what?

5    A      Indicating.

6    Q      And where did he passively indicate at?

7    A      He did not.

8    Q      And what's passive indicate mean?

9    A      A final response to the odor of narcotics.

10   Q      So he never did that?

11   A      He never gave a final response, no.

12   Q      So he never -- he never gave you the dog's nod that

13   there's something in the truck?

14   A      He did.  That was the profound alert.

15   Q      What's that?

16   A      That was the profound alert.

17   Q      What's the difference between profound alert and the

18   passive response?

19   A      I explained it.

20   Q      I understand you've explained it, but if you could tell

21   me, if you would explain, tell me the differences again.

22   A      An indication is when he's pinpointed the odor, when he

23   knows exactly where it is or he's as close as he can get to it

24   and that's where he sits down, lies, stands, he gives a final

25   response.  A profound alert comes before an indication and

Melder - Cross

1    that's the changes in behavior that he exhibits showing that

2    he's in the odor, but maybe he can't pinpoint it.

3    Q    Since we don't have a passive alert, is the other one on

4    tape at all?

5    A    Passive indication.

6    Q    We don't have that, right?

7    A    That's right, he didn't give an indication.

8    Q    Do we have the other one on tape?

9    A    Yes.

10   Q    Where is he at when that happens?

11   A    He did it twice.  Once under the trailer, once he's at

12   the back door.

13   Q    So there's video of him under the trailer?

14   A    Yeah.  I don't know if you can see it from the video, but

15   there's video of me running my dog the whole time.

16   Q    Have you seen it?

17   A    Have I seen the video?

18   Q    Yeah.

19   A    Yeah.

20   Q    Can you see the dog underneath the trailer?

21   A    Yes, once toward the back doors and then there's another

22   time that no, you can't see him because of the angle of the

23   video.

24   Q    You're saying that the recording shows the dog underneath

25   where the doors are, underneath the trailer at the back door?

Melder - Cross

1    A    Yes, sir.

2    Q    Okay.  And who controls that recorder?

3    A    That's in the vehicle.

4    Q    Is that MVR going?

5    A    I don't know what that means.

6    Q    What's recording that?

7    A    My in-car video camera.

8    Q    Who's controlling that?

9    A    When it's running, recording?

10   Q    Yeah.

11   A    Running by itself.

12   Q    So it's got a mind of its own, you can't turn it on and
13   off?

14   A    I turn it on and off.

15   Q    Who decides when it gets turned off?

16   A    I do.

17   Q    So tell the judge about how much of that video shows the
18   doors being opened on that truck?

19   A    It never does.

20   Q    Why is that?

21   A    Why does it?  Because I turned it off.

22   Q    Why?

23   A    Because my only concern was getting the dog running the
24   vehicle on tape.  That's all I was concerned with at the time.
25   That's what I was there to do.  That was my job.

Melder - Cross                                    77

1   Q     Your job apparently was also crawling into the trailer
2   and seeing if you could find contraband, correct?
3   A     What?
4   Q     Was getting in the trailer and seeing if you could find
5   contraband, correct?
6   A     Yes.
7   Q     Is that part of your job?
8   A     Yes.
9   Q     Was that recorded?
10  A     No.
11  Q     Why?
12  A     Because I turned it off.
13  Q     Why?
14  A     I have no idea.  Because at the time what I was concerned
15  with was me running my dog and getting that on video and that's
16  what I got on video and I turned it off.
17  Q     You're talking about the dog under the trailer on video?
18  A     I'm talking about the whole thing when I ran my dog.
19  Q     But I'm asking you specifically, again, so I'm clear, you
20  said that the video shows the dog underneath the door of the
21  van, of the trailer?
22  A     Yes, it does.
23  Q     Like underneath the trailer?
24  A     Underneath the trainer.
25  Q     And once you get that, what do you have to do to turn off

Melder - Cross

1    your video?

2    A    Push stop.

3    Q    On what?

4    A    On the display inside.

5    Q    So you have to get inside and do it?

6    A    Right.

7    Q    You don't just accidentally bump something on your chest

8    or something?

9    A    No.

10   Q    You have to go inside and actually turn it off?

11   A    Right.

12   Q    You went inside and actually turned it off before you did

13   the search?

14   A    That's right.

15   Q    Now, you said that you never saw Mr. Leon?

16   A    I don't remember seeing Mr. Leon, no.

17   Q    When you went up to the front of the truck running with

18   the dog, did your counter clockwise search around, did you see

19   him standing there?

20   A    I didn't notice him standing there.  He could have been,

21   but I don't remember.

22   Q    How many people were there when you got there?

23   A    When I got there, there were two.

24   Q    Well, there's three people in the video when you run by.

25             THE COURT:  So we're clear, we're talking about

Melder - Cross

1    officers, not --

2              MR. JAMES:  I'm talking about people.

3              THE WITNESS:  Then there was three.  When I pulled

4    up, there was three people there:  Mr. Leon, Corporal Craig,

5    and the person that was riding with him.

6    BY MR. JAMES:

7    Q    So if there's three people -- I want to make sure I'm

8    clear.  If there are three people on your video, that would be

9    Mr. Leon, Corporal Craig, and somebody else?

10   A    That was riding with him, yes.

11   Q    So the person that's riding with Mr. Craig is out of the

12   vehicle?

13   A    I think he was, yeah.

14   Q    Did you have contact with him?

15   A    Like did I talk to him?

16   Q    How did you know who he was?

17   A    Because he had been riding with us the whole time we were

18   there.

19   Q    I mean, you're not riding in the same car with Mr. Craig,

20   are you?

21   A    No.

22   Q    So how do you know who he is?

23   A    He's a police officer.

24   Q    Where at?  From where?

25   A    Tennessee.

Melder - Cross

1          MR. GIVENS:  Your Honor, I'm going to object.  I

2    understand the quantity of officers is a relevant question, but

3    whether he knows who this person is or not, I'm not sure what

4    the relevance of this is.

5          MR. JAMES:  I think it's important because we've had

6    some prior testimony about what that officer was doing from the

7    other officer and I think this goes toward that.

8          THE COURT:  Then ask what he was doing.

9          MR. JAMES:  Sir?

10          THE COURT:  Ask what the guy was doing.  We've

11   established he was an officer.

12          MR. JAMES:  I'm trying to make sure that's who it

13   is, we're talking about the same person.  I'm sorry, Your

14   Honor.

15   BY MR. JAMES:

16   Q     What was he doing?

17   A     He was there doing a ride along.

18   Q     What was he doing when you saw him?

19   A     He was standing there with Corporal Craig, I believe.

20   Q     At the back of the trailer?

21   A     That's right.

22   Q     So the three individuals that we see in the tape of you

23   running the dog around are Mr. Leon?

24   A     No.

25   Q     No?  Who are they?

Melder - Cross

1   A     One of them was riding with me, one was riding with

2   Corporal Craig, and then Corporal Craig.  That makes those

3   three people plus Mr. Leon, and he wasn't visible in the video

4   when I pulled up there.

5   Q     I understand, but you saw more than the video, right, you

6   had your -- you never saw Mr. Leon?

7   A     Not that I recall.

8   Q     So Mr. Leon -- because a minute ago you said Mr. Leon was

9   standing with Mr. Craig.

10  A     I don't think so.

11  Q     You said one of the three people, wasn't he?

12  A     No.

13  Q     So now you're saying --

14  A     I haven't changed my testimony.  There were three people

15  when I pulled up.

16  Q     I'm asking you to clarify who the three people were one

17  last time and I'll move on.

18  A     Mr. Leon.

19  Q     Is one of the three people at the back?

20  A     No, you asked me who was there.

21        THE COURT:  Let's start from the beginning.

22  BY MR. JAMES:

23  Q     Who's in the video?

24  A     In the video, there's Corporal Craig, and then there's

25  the person that was riding with Corporal Craig, I had a rider,

Melder - Cross

1    and then there was me.

2    Q    So the individual that was with Mr. Craig was out of the

3    vehicle?

4    A    That's right.

5    Q    He was not sitting in Mr. Craig's vehicle just doing

6    whatever he was doing?

7    A    When I pulled up, no.

8    Q    So tell me about your contact with Mr. Craig prior to him

9    calling you there.

10   A    Prior to him calling me there?

11   Q    Yeah.

12   A    We were just in Lonoke County working.

13   Q    I understand, but Lonoke is a big county.  So are you

14   having contact with him, are you guys going to the same calls

15   or tell me about your contact that you were having with

16   Mr. Craig prior to him calling you and asking you to bring the

17   dog.

18   A    I'm sure we talked on the phone some, we probably had

19   lunch together.

20   Q    So you don't remember anything specific?

21        MR. GIVENS:  Objection, Your Honor.  I have no idea

22   what the relevance of this is.

23        THE COURT:  I'm going to overrule the objection.

24        MR. JAMES:  Thank you, Your Honor.

25        THE WITNESS:  What was your question?

1  BY MR. JAMES:

2  Q     Had you been talking to him?  Did you know he was doing

3  the stop?

4  A     You asked me before the stop, before he contacted me

5  about the stop, what we were doing.

6  Q     Yeah.  I'm asking you about your contact with him prior

7  to him asking you to bring the dog.

8  A     About the -- I don't understand what you're asking.

9  Q     It's a pretty simple question.

10  A     No, it's not.

11  Q     It is.  Did you have any contact with him prior to him

12  calling you and asking you to bring the dog that day?

13  A     Yes.

14  Q     Tell me about that.

15  A     We ate lunch together, I'm sure.  We'd been stopping

16  cars.

17  Q     Why are you sure you ate lunch with him?

18  A     Because that's usually what we do when we're working

19  together.

20  Q     Do you have any independent memory of that day before he

21  calls you?

22  A     Other than we were working in Lonoke County, no, but we

23  had --

24           THE COURT:  Mr. James, I'm going to allow you some

25  leeway in determining how they knew they were in proximity to

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Melder - Redirect

1    each other, but what they had for lunch and when they usually

2    eat lunch together is beyond that.

3              MR. JAMES:  I just asked him if he had independent

4    memory of that or if he's just generalizing what happened

5    because it's what happens every day.

6              THE COURT:  I heard what you said, and I asked you

7    to --

8    BY MR. JAMES:

9    Q    I'm asking specifically, do you have any specific

10   memories of any contact that you had with Mr. Craig prior to

11   him calling you and asking you to bring that dog?

12   A    We had talked on the phone.  I can't tell you when, but

13   we had talked on the phone.

14   Q    You don't have any idea what the time frame was?

15   A    No.

16   Q    Did you have any -- you say you saw Mr. Leon.  Did you

17   see him?  Did you have any conversation with him or hear him

18   say anything?

19   A    No, sir.

20   Q    That's all I have.  Thank you, Trooper.

21                        REDIRECT EXAMINATION

22   BY MR. GIVENS:

23   Q    Corporal Melder, when you ran Pavatt around the car, were

24   you looking around trying to see where other people were?

25   A    No, sir.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1    Q      What were you looking at?

2    A      My dog.

3    Q      What was your attention focused on?

4    A      My dog.

5    Q      Thank you.

6           MR. JAMES:  No other questions, Your Honor.

7           THE COURT:  You can step down.  He's going to ask

8    that you remain under the rule, sir.  I don't know that he has

9    to have a reason, he just had to have a reason for not

10   objecting.  Go ahead.  You're free to go if you'd like, I'm

11   assuming.

12          MR. JAMES:  No objection to him --

13          THE COURT:  The probability of him calling is minor.

14          MR. JAMES:  I have no objection to him leaving the

15   building.

16          THE COURT:  Okay.

17          MR. GIVENS:  Your Honor, I would call DEA Special

18   Agent Scott Cunningham.

19       **SCOTT CUNNINGHAM, GOVERNMENT'S WITNESS, DULY SWORN**

20                       DIRECT EXAMINATION

21   BY MR. GIVENS:

22   Q     Good afternoon.  Please tell the Court your name, where

23   you work.

24   A     My name is Special Agent Scott Cunningham.  I work for

25   DEA, the Drug Enforcement Administration, here in Little Rock,

Cunningham - Direct

1    Arkansas.

2    Q       How long have you been working for the DEA?

3    A       Over 17 years.

4    Q       Do you conduct methamphetamine investigations as part of

5    your duties?

6    A       Yes.

7    Q       Do part of your duties also involve interrogating

8    suspects?

9    A       Yes.

10   Q       Are you familiar with the defendant here today, Javier

11   Leon?

12   A       Yes, I am.

13   Q       Have you spoken with him before?

14   A       Yes.

15   Q       Did you speak with him on March 30th of 2015?

16   A       Yes, I did.

17   Q       And Agent Cunningham, we talked about the interview, but

18   understand this isn't a guilt or innocence situation, I want to

19   talk to you about the interview for a limited purpose of asking

20   you a few questions about your understanding of his

21   comprehension of English.  Do you understand the scope of what

22   I'm asking?

23   A       Yes.

24   Q       Where did you speak with him?

25   A       The first place I spoke with him was at the co-op, a

Cunningham - Direct

1   cooperative business located in rural Lonoke County.

2   Q    All right.  And what was the -- why were you both at the

3   co-op?

4   A    I was there because I had got a call from the state

5   police to assist them in an investigation into the seizure of a

6   large load of methamphetamine.  That's where Javier's

7   18-wheeler had been driven to.

8   Q    And did that large load come out of Javier Leon's

9   18-wheeler, the trailer?

10  A    Yes.

11  Q    Okay.  Mr. Leon was at the co-op where his 18-wheeler

12  was?

13  A    Yes, he was.

14  Q    And why did you have contact with him there or what was

15  the nature of that contact, I'm sorry?

16  A    When I got to the co-op, I was getting the tag

17  information off the tractor trailer, and Javier was there and

18  someone told me that that is the driver and I introduced myself

19  to him and told him my name.

20  Q    All right.  And did he respond to you?

21  A    He did.

22  Q    In what language?

23  A    English.

24  Q    What was his response?

25  A    After I told him who I was, he commented that -- after I

1    told him who I was, I asked him where he was from and he said

2    that he was driving from Mexico to Riverside, California.  I

3    didn't ask him any questions after that.

4    Q    Okay.  Was your next contact with him in Lonoke County

5    Detention Facility?

6    A    Yes.

7    Q    And that's what I really want to talk to you about.  At

8    the jail, first thing, did you go over his rights with him?

9    A    Yes, I did.

10   Q    All right.  And was that done in English or Spanish or

11   both?

12   A    I read Javier his rights per the *Miranda* warning in

13   English.

14   Q    And did he indicate that he understood those?

15   A    He did.

16   Q    And then did you have him sign a waiver form?

17   A    Only after I again read his rights to him, but he read

18   along from the Spanish side of the *Miranda* form.  Only after

19   that did we have him sign.

20   Q    What did he say to you about speaking and understanding

21   English versus reading English?

22   A    After I read his rights and he said he understood the

23   rights, before I handed him the rights form, Agent Venetta,

24   John Venetta, who is also a DEA agent who was also there with

25   me during the interview, asked Javier if he could read English,

1  and Javier's response was -- he seemed like he had a negative

2  response by his demeanor, but he did say a little bit.  So at

3  that point, I made the decision to allow him to read the

4  *Miranda* warning, the Spanish version, which is printed on the

5  backside of the English version.

6  Q     So it was on the same form, but he read it.  Did he

7  indicate to you he had any trouble understanding English and

8  what you were saying to him?

9  A     No, he didn't.

10  Q     And did he waive his rights?

11  A     He did.

12  Q     Pursuant to *Miranda*, all right.  Following that, did you

13  interview him?

14  A     Yes.

15  Q     About how long did that interview take place?

16  A     The interview was video recorded.  The video recording of

17  the first interview was approximately 63 minutes.  Then we cut

18  the video off for a few minutes and then conducted a second

19  interview which was approximately four minutes long.

20  Q     So you spoke with him for approximately 67, 68 minutes?

21  A     Yes.

22  Q     And I'll get into a few specifics, but over the course of

23  those 68 minutes, at any point did he tell you he didn't

24  understand what you were asking him or didn't understand the

25  question?

Cunningham - Direct

```
1    A      It was a long interview and I do not remember at any
2    point where he stopped me and asked me to clarify anything I
3    was saying because he didn't understand my English.
4    Q      Was he responsive to your questions?
5    A      Yes.
6    Q      For example, when you asked him where he was living, did
7    he answer that?
8    A      Yes.
9    Q      When you asked him questions about his finances, did he
10   answer that?
11   A      Yes.
12   Q      Did he talk to you about specifics of identifying
13   information and did he give you specific answers beyond
14   generalizations?
15   A      Yes, he did.
16   Q      Did he ever ask for an interpreter?
17   A      No.
18   Q      Did you ever have -- you just testified that he never
19   asked you to clarify a question or say he didn't understand
20   you.  Did you have any trouble understanding him or not
21   understanding what he was doing?
22   A      Yes, I did.
23   Q      Please explain to the Court what you're talking about
24   when you say you did.
25   A      There were times throughout the interview where I could
```

1    not understand Javier.  I could not understand a word he said.

2    And those times that I'm thinking about right now refer to

3    instances during the interview when he gave us a name of a city

4    or street that I could not understand his pronunciation of

5    that, so I had to --

6    Q    Was there a city in Oklahoma, for example?

7    A    Yeah, there was.

8    Q    How did that exchange go?

9    A    There was a part of the interview where I was trying to

10   determine where he had stayed the night before and his route

11   from where he stayed at the night before until he got stopped.

12   And the answer he gave me I could not understand, but he did

13   spell it for me.  It sounded like an S word, but he spelled it,

14   and when he spelled it although not exactly the correct

15   spelling, it was Shawnee and we confirmed Shawnee, Oklahoma

16   because I knew there was a Shawnee, Oklahoma on the route, and

17   he confirmed that that's correct so he spelled it out for me.

18   Q    After you said Shawnee, did he indicate that was correct?

19   A    Yes.

20   Q    These times you talked about not understanding, was it

21   related to specific places and not understanding his accent?

22   A    They were places in that they were cities and a street

23   and there was one time when he said that he was talking to

24   his -- he was explaining to me what happened on the traffic

25   stop and he -- I couldn't understand the way he said

1    electrician.  So in one instance it was a person that I

2    couldn't understand.

3    Q     Taken as a whole, did you feel the two of you were

4    communicating?

5    A     I felt our communication was very good.  Javier being

6    from Hispanic decent, he spoke English, which I thought was

7    good, and with a Hispanic accident or Latino accident.  So I

8    did listen carefully because I don't hear that speaking every

9    day, but the conversation between he and I was good.

10   Q     Was there ever a time he gave an answer completely off

11   the wall that had nothing to do with the question that you

12   asked, for example?  Did he ever give an answer completely

13   unresponsive to your question?

14   A     Not that I can think of right now.

15   Q     As if he didn't understand what you were asking him?

16   A     No.  I don't recall one where he completely didn't

17   understand what I was saying to him.

18   Q     All right.

19         Your Honor, I'll pass the witness.

20                         CROSS-EXAMINATION

21   BY MR. JAMES:

22   Q     I'm sorry, when did you say that you came into contact

23   with Mr. Leon first?

24   A     It was March 30th, 2015, at the co-op which was located

25   in Lonoke County.

1   Q     That's the co-op we heard someone talk about earlier.  Do
2   you know where that's at?
3   A     I do.  That's --
4   Q     Go ahead.
5   A     That's a co-op located in rural Lonoke County.  I'd never
6   been there before, but I was called there because that's where
7   the state police had driven the 18-wheeler to and that's where
8   I was going to go to see what was going on with this stop.
9   Q     Are we talking about like a farmers co-op?
10  A     Yes.
11  Q     So this is not a police station?
12  A     No.
13  Q     So you take him to a co-op in the middle of a field, I
14  assume?
15  A     No, I did not take him.
16  Q     He was there?
17  A     He was there.  He was.
18  Q     Was the Lonoke Police Department or sheriff's office not
19  available?
20  A     I do not know.  That's where the state police told me
21  that the truck was going to be unloaded, that's where I went.
22  Q     Not to belabor, you've never been there before?
23  A     Never.
24  Q     So you know of no common policy or habit of taking people
25  there?

```
 1              MR. GIVENS:  Your Honor, objection.  He was in
 2   custody at this point.  The search already happened.  I don't
 3   believe that's relevant to the purpose of this hearing.
 4              MR. JAMES:  I'm moving on.
 5              THE COURT:  That was my next question, have you got
 6   what you need on that subject.
 7              MR. JAMES:  I just wanted to make sure we had some
 8   idea where we were at.
 9   BY MR. JAMES:
10   Q    Did you say that -- was the first interview real short?
11   One's about an hour?
12   A    My first encounter with Javier ever was at the co-op
13   standing near the tractor part of the 18-wheeler because the
14   trailer had been backed up to a dock.  And someone there, I
15   don't remember who, said this is the driver.  And I introduced
16   myself to him as Agent Cunningham with the DEA and asked his
17   name.
18   Q    Did you say that he at some point told you he was going
19   from Mexico to California?
20   A    We did ask him where he was from and then he said he was
21   traveling from Mexico to Riverside, California.  So later I
22   asked him that in the recorded video to clarify it and he later
23   clarified that for me.
24   Q    That he was driving from Mexico to California?
25   A    That is correct.  He was not driving from Mexico to
```

Cunningham - Cross

1    California.  He was from Mexico and he lived in Riverside.

2    Q      Okay.  So when you first heard that, was it him saying

3    that or is that what you understood him to say?

4    A      No, he said that to me.

5    Q      So he did answer kind of a gibberish answer when you

6    asked him something and his response was, I'm driving from

7    Mexico to Riverside, California?

8    A      That's what he said.

9    Q      And that is arguably a gibberish answer or it's a non

10   sequitur if nothing else?

11   A      He was clear when he said that, I understood what he

12   said.

13   Q      But then every time else you asked him where he was

14   going, he indicated he was going east from California, correct?

15   Is there anywhere else in the hour interview where he indicates

16   he was ever driving from Mexico?

17   A      No, he did not.  He never said that he was driving from

18   Mexico again.

19   Q      Just the first time.  And that's not possible that you

20   misunderstood him or he misunderstood you?

21   A      I can't speak for him, but I remember him clearly telling

22   me that.  I don't think I misunderstood.

23   Q      And what was the question that you asked him?

24   A      I introduced myself to him as an agent with the DEA and I

25   asked him where was he coming from.

Cunningham - Cross

1   Q     All right.  Now, when you were reading, you read the

2   rights forms and did you have him going back and forth asking

3   if what you told him in English was what it said in Spanish?

4   Did I understand you to say that?

5   A     I first read him his *Miranda* rights off the DEA *Miranda*

6   warning form.  I read them to him.  He didn't have the rights

7   in front of him.  I just read them verbally, asked him if he

8   understood those rights, he said that he did.  As the second

9   part of that, I wanted him to initial the rights.  I wanted for

10  him to read the rights and initial, confirming that he

11  understood his rights.  Agent Venetta asked him as I was

12  handing him the paper, the rights form, Do you read English?

13  And that's when he indicated or he said, Only a little bit.

14      At that time, I shifted gears, I made the decision to not

15  show him the rights in English but flip the form and let him

16  read in Spanish as I read in English.  That's what we did.

17  Then I read each right to him and then Agent Venetta sat down

18  beside him to assist him and point to the right that I was

19  reading and then I read the right and I said, Okay, Javier, is

20  that what you're reading in Spanish?  And once he said okay,

21  then he initialed it and we went to the next one.

22  Q     So I'm clear, you talked to him in English?

23  A     Yes.

24  Q     And did you ask him if he could read Spanish?

25  A     Agent Venetta did.  He said, Can you read?  Actually he

Cunningham - Cross

1   did both.

2   Q    So you're reading to him in English and then asking him

3   if that's what it says, so if he doesn't understand what you're

4   saying, he might have trouble with that comparison?

5   A    I didn't understand the second part of your question.

6   Q    If he is having trouble understanding what you're saying

7   in English, then he might have trouble understanding whether

8   what you said in English and what he said in Spanish, what he

9   was reading in Spanish is the same thing?

10   A    No, sir.  I think that he understood what I said.  When I

11   read the rights in English, he said he understood.  I feel like

12   he understood.  But he said -- if I can please finish, sir.

13   Q    Talk away, man.

14   A    That he only understood -- he only understood to read

15   English a little bit.  So then that indicated to me that he

16   could not read English very well.  He could understand it, but

17   he couldn't understand it as he read it.

18   Q    Do you have that rights form with you?

19   A    No, sir, I do not.

20   Q    Did he sign anything?

21   A    Yes, he did.

22   Q    Did he sign the Spanish one or the English one?

23   A    I would have to look at it.  I don't remember which side

24   he signed.

25   Q    Why would you have him sign the English one?

1    A    I wouldn't have.  I would have him -- I would have had

2    him sign the Spanish side since he read it and understood it.

3    But I cannot confirm that because I don't remember which side

4    he signed, but I do have that document in evidence that I can

5    present to you.

6    Q    Okay.  Now, Agent Banetta (sic) was there also, correct?

7    A    It's Agent Venetta with a V.

8    Q    I'm sorry.  How many times did he have to stop what you

9    were asking and clarify and make sure that Mr. Leon understood

10   what you were saying?

11   A    I don't remember.

12   Q    So you don't recall?

13   A    Agent Venetta was there and he was also asking questions.

14   Q    Okay.  But you don't recall Agent Venetta ever having to

15   say, hey, make sure you understand, and kind of reclarify

16   because he had some concerns about Mr. Leon being able to

17   understand what you were saying?

18   A    I don't remember Agent Venetta having to do that.

19   Q    Okay.  Did Mr. Leon ever say he was confused during the

20   questioning?

21   A    I don't remember if he used the word "confused", but yes,

22   there were times during the interview where he was confused,

23   especially using verbal language.  There was some content in

24   the interview that was confusing to him and confusing to me.

25   Q    Okay.  How was his demeanor during the interview?

1   A      He was calm, he was cooperative.

2   Q      Did you find him like over the top nervous?

3   A      No.

4   Q      There's a video of this recording, correct?

5   A      Yes.

6   Q      And he's talking with his hands a lot, isn't he?

7   A      He does do that.

8   Q      That's what he does.  I don't know, but that's what he's

9   doing in that recording?

10  A      At times he does use his hands.

11  Q      And so does it surprise you that when he's talking to the

12  other officer that he's using his hands?

13  A      No.

14  Q      You said you did have trouble sometimes understanding

15  what he was saying?

16  A      Yes.

17  Q      And did you ask him to clarify when you had concerns

18  about what he was saying?

19  A      Yes.

20  Q      You recognize that somebody with a thick accent like that

21  is sometimes hard to understand?  You agree with that?

22  A      Yes.

23  Q      And do you also agree with me that when listening to

24  someone like that, if you're trying to really understand them,

25  you may have to clarify some things?  The more you care about

1    what they're saying, the more important it is to maybe clarify

2    sometimes?

3    A    Yes.

4    Q    Do you agree with that?

5    A    I do.

6    Q    I mean, if you don't care what they're saying then it

7    really doesn't matter what they say or not.  Do you agree?

8    A    In this situation, I did care what he was saying.

9    Q    I'm not saying you didn't.  I'm just saying that's why

10   you said, hey, let's make sure we know what you're talking

11   about, where you're talking about in Oklahoma, and he gave you

12   routes and where he was planning on going, correct?

13   A    Yes, he did.

14   Q    Did you match those up with the bill of lading and the

15   information that he had in the truck that he had given to

16   Mr. Craig?

17   A    I matched that up with what Javier told me using several

18   resources.

19   Q    Okay.  Were they consistent?  Was there anything about

20   what he told you that turned out to be false?

21   A    The route was consistent.  We even reviewed the bill of

22   lading with him in the interview.

23   Q    I guess --

24   A    Sir, there was parts of the interview that were confusing

25   about where he stopped along the route and how long he stayed

1    there.  That was the confusing part to me, and it seemed like

2    it was confusing to Javier too.

3    Q    Well, I mean, part of that confusion you described, that

4    was the Shawnee discussion, correct?

5    A    That was part of it.

6    Q    And that went on for quite a ways, I mean, that went on

7    for a few minutes, the whole Shawnee thing?

8    A    I would say a few minutes is correct, sir.

9    Q    Now, the interview that -- the first contact you had in

10   the Mexico to California statement, that's not recorded,

11   correct?

12   A    No.

13   Q    That was just outside the truck?

14   A    Yes.

15   Q    Just a moment, Your Honor.  That's all I have.

16        Thank you, Agent.

17                    REDIRECT EXAMINATION

18   BY MR. GIVENS:

19   Q    If Mr. Leon was nonresponsive to your questions, would

20   your interview have gone on for 63 minutes?

21   A    No.

22   Q    Does there come a point where you realize you're not

23   getting through to a suspect and you cut off the interview?

24   A    Yes.

25   Q    Did that happen in the first ten minutes of this

1    interview?  Did you stop it early?

2    A    No.

3    Q    If you were not understanding his answers to you, would

4    you have let this go on for 68 minutes?

5    A    No.

6    Q    If you two were not communicating and understanding each

7    other, whatever the content was, I realize there's some

8    confusing content about specifics, places, dates, but just

9    simple understanding, if you two did not understand each other

10   and what you were each trying to get at, would this interview

11   have gone on for more than an hour?

12   A    No.

13   Q    Was there any point during this interview that you felt

14   he did not understand English to the point where you needed to

15   cut the interview off?

16   A    No.

17             MR. GIVENS:  That's all I have.

18             MR. JAMES:  No other questions, Your Honor.

19             THE COURT:  You can step down, sir.  Does that

20   conclude the government's proof?

21             MR. GIVENS:  It does, Your Honor.

22             THE COURT:  You got any witnesses, Mr. James?

23             MR. JAMES:  Yes, Your Honor, we'll have one.

24             MR. KAISER:  Just Mr. Leon himself, Your Honor.

25             THE INTERPRETER:  Could the interpreter have a brief

1    break?

2                THE COURT:  You may.  Court will be in recess for

3    ten minutes.

4           (Recess from 3:40 PM until 3:48 PM.)

5                THE COURT:  Back on the record.

6                MR. KAISER:  The defense calls Javier Leon.  Your

7    Honor, just for the record, we're going to limit this

8    examination specifically to where Mr. Leon was located while

9    waiting for the K-9 and when he specifically was handcuffed

10   during the encounter.  May I proceed, Your Honor?

11               THE COURT:  You may.

12               MR. GIVENS:  I just want to -- if we can clarify the

13   scope, I realize we can't ask cross questions beyond the scope,

14   I certainly have no intention of asking him anything about the

15   results of the search or anything of that nature, but if we're

16   talking about locations during the time between when the search

17   occurred, how limited am I in questioning things that happened

18   from the time Trooper Craig approached until the time the

19   search began, essentially, I guess is my question?

20               THE COURT:  In a vacuum, Mr. Givens, I'm not going

21   to be able to answer that question.  If you ask a question that

22   I think is beyond that scope, I'll let you know, if it's

23   objected to.

24               MR. GIVENS:  Fair enough, Your Honor.

25               THE COURT:  Anticipate where you might be on the

1    margin, I don't know that I can tell you that, especially not

2    hearing how far we go if Mr. Kaiser goes beyond what he said

3    his scope was.  I'm not going to let him define his scope and

4    then go beyond it.

5                    MR. KAISER:  Thank you, sir.

6                         DIRECT EXAMINATION

7    BY MR. KAISER:

8    Q    Will you please introduce yourself to the Court and

9    everyone in it.

10   A    My name is Javier Leon.

11   Q    You've heard all the testimony that's happened today?

12   A    Yes.

13   Q    And so Mr. Craig said he believed you were standing

14   between the front of your truck and his police car after he had

15   you open the back door of the trailer, but no one seems to know

16   specifically where you were.  Where were you?

17   A    I was right in the middle in between the truck and the

18   car.  He told me to stay here and so that's where I stayed

19   until they put the handcuffs on me.

20   Q    So when you say he, are you referring to Mr. Craig?

21   A    Yes.

22   Q    How long were you in that spot?

23   A    From the time it started, more than a half an hour.

24   Q    And did you feel free to just jump back in your truck and

25   leave the scene while waiting in that spot?

1   A     No.  He told me to stay there, and I have to follow the

2   rules of the police.  That's how I was taught, to respect what

3   the police say.

4   Q     One last question, Mr. Leon.  In relation to when the dog

5   was running around your truck, when were you cuffed?

6   A     I just saw that the dog went all the way around the

7   truck.  I didn't see anything else because they told me to look

8   toward the car, and so I had my back to the truck.  So I just

9   know that the dog went all the way around the truck, but I

10  didn't see the dog go up inside the trailer.

11  Q     You were cuffed after you saw the dog walking around?

12  A     It was quite a while after.

13               MR. KAISER:  Pass the witness, Your Honor.

14                        CROSS-EXAMINATION

15  BY MR. GIVENS:

16  Q     Good afternoon, Mr. Leon.  I want to be sure I'm clear on

17  your testimony.  You were located --

18  A     Good afternoon.

19  Q     -- I wrote down in the middle between the truck and the

20  car.  Is that correct?

21  A     Yes.

22  Q     And the truck is your truck and the car is the police

23  car?

24  A     Yes.

25  Q     And Mr. Craig told you to stand there when the dog

Leon - Cross

1    arrived?

2    A     No.   Before the dog got there, he told me stand there and

3    stay there.

4    Q     And your testimony is that you were there more than half

5    an hour?

6    A     Yes.

7    Q     Were you wearing a watch?

8    A     Not exactly, but it was a half hour.   I was looking at my

9    watch and seeing how long things were taking.

10   Q     You were -- when you say it was more than a half hour,

11   you're assuming, that's what you feel like, it was more than

12   half an hour?

13   A     Yes.   It was more than a half hour.

14   Q     Well, okay.   Tell me the time you got to that spot and

15   the time you left that spot then.

16            MR. KAISER:   Objection, Your Honor.   I believe this

17   is cumulative.   He's answered the question several times.

18            THE COURT:   Overruled.

19            THE WITNESS:   I was so scared, I just saw them

20   talking on the radio and they were calling someone else in and

21   waiting for them to come.

22   BY MR. GIVENS:

23   Q     And I understand that.   What I'm trying to figure out is

24   how you know that it was more than half an hour.   You said you

25   were looking at your watch, so what -- what time -- do you

1  remember what time that you got to that spot?

2  A      Because when they got there and they finally put the

3  handcuffs on me, it was after 4:30.

4  Q      And what time did you get to that spot?

5  A      I got there because that was when I had to take my

6  medicine for my diabetes and I needed to go pee.  So I peed and

7  then I got back in my truck to turn it on and that's when he

8  pulled up and I couldn't leave.

9  Q      What time did Officer Craig tell you to stand in that

10 spot?

11 A      At about 4:10.

12 Q      And you know this from looking at your watch?

13 A      I didn't check.  I was so nervous.

14 Q      That's understandable.  I believe that you were very

15 nervous.  If you didn't check your watch, how did you know that

16 it was 4:10?

17 A      When he put the handcuffs on me, I saw.

18 Q      But you don't know that it was 4:10.

19 A      No, when they put the cuffs on me, it was after 4:30.

20 Q      How much after 4:30?

21 A      It was about that time.  It was about that time when they

22 put the cuffs on me.

23 Q      So it was about 4:30, correct?

24 A      Yes.

25 Q      That's not after 4:30; that's about 4:30.  Correct?

1    A      That's right.

2              MR. GIVENS:  I think I've completed the confines of

3    my scope, Your Honor.

4              MR. KAISER:  We have nothing further, Your Honor.

5              THE COURT:  You can step down.

6              MR. KAISER:  And we have no more witnesses at this

7    time, Your Honor.

8              THE COURT:  Does either side have anything more for

9    their record?

10             MR. GIVENS:  Your Honor, nothing outside of

11   argument.

12             MR. KAISER:  Same, Your Honor.

13             THE COURT:  That's what I meant, do you have any

14   argument to put forward in addition to what might be contained

15   in y'all's briefings?

16             MR. GIVENS:  I believe so, Your Honor.

17             THE COURT:  All right.

18             MR. GIVENS:  Your Honor, just because it's fresh on

19   my mind because it just happened, I'd like to.

20             THE COURT:  Yours or mine?

21             MR. GIVENS:  I'd like to begin by pointing out to

22   the Court, which I'm quite sure the Court was aware, but

23   Mr. Leon was answering my questions as well as Mr. Kaiser's

24   questions right before the interpreter was interpreting for

25   him, and in fact, he answered the first question about his

1    name, he answered that in English.  And quite often, he began
2    answering questions even if he was doing it in Spanish, he
3    began answering those questions prior to having the question
4    interpreted for him.  And that just goes to show his
5    understanding of the English language and his comprehension of
6    what was going on here today as well as what was going on on
7    March 30th.
8         Your Honor, the facts are before the Court now and I
9    realize there's some, I can't say they're uncontested facts,
10   but the gist of this case is that Mr. Leon was approached
11   around 4:00, even by Mr. Leon, approached around 4:00, on
12   March 30th of 2015.  What happened that followed is a search
13   and an ultimate seizure of both him and the methamphetamine in
14   his truck.  I began today by talking about multiple reasons why
15   everything that happened from that initial encounter was
16   lawful, and now that the facts are out, they can fill in the
17   law that the Court has some of it before it and I know it will
18   continue to look at this, but there's quite a large body of law
19   about these type of encounters.  Your Honor, nobody disputes
20   that Corporal Craig had a right to approach Mr. Leon.  That's
21   not what this is about.  He was illegally parked in an onramp.
22        The question is really did he unlawfully extend that
23   initial approach.  And he did not -- he did extend it, but it
24   was justified in a variety of different ways.  And they're not
25   -- they're not dependent upon each other.  The Court can find

1    any reason, any number of these is the reason why this is a

2    lawful stop beginning with reasonable suspicion.  And once

3    Corporal Craig saw the extreme nervousness coupled with not

4    having a viable reason for being illegally parked in an onramp

5    coupled with discrepancies in his experience and his logbook,

6    that created reasonable suspicion, which is a lower standard

7    than probable cause and simply requires some articulable facts

8    to demonstrate a belief that there was criminal activity afoot.

9         Now, Mr. Leon has submitted in his briefings that there

10   is case law that says nervousness in and of itself is not

11   enough.  And there is case law that says that having just a

12   hunch, just a gut feeling based on somebody's nerves, that's

13   not enough, but that's not what we had in this case.  A 34-year

14   trooper felt that this was a gross overreaction, and we also

15   talked about the other discrepancies of the logbook as well as

16   not having a viable reason to be where he was.  All that

17   coupled together gave him reasonable suspicion to extend the

18   stop that led to the dog sniff which developed probable cause,

19   and there's really no dispute that a dog sniff gives probable

20   cause to continue the search.  So the real question here is can

21   the stop be extended from the time the reason for the stop was

22   completed until that dog sniff, and there was reasonable

23   suspicion to extend it asking for the dog.

24        Now, even if this court were to find that there was not

25   reasonable suspicion based on Mr. Leon's demeanor, based on his

1   nervousness and the discrepancies in the logbook, this stop

2   never turned in to a *Terry* stop to the point where you even had

3   to have reasonable suspicion, and that was because of the

4   timing of the stop, Your Honor.  Now, again in briefings, in

5   today's briefing, Mr. Leon stated that you had to have

6   reasonable suspicion to have a dog sniff.  That's not exactly

7   true.  Mr. Leon's first motion had the correct law.  In March

8   of 2015, *Rodriguez* had not yet been decided.  That was decided

9   in April 2015.

10          The state of the law today based on *Rodriguez* is that in

11   order to extend a stop even for a few minutes to call for a

12   dog, there must be reasonable suspicion.  You can't just call

13   dogs for no reason.  That wasn't the law in March of 2015.  In

14   March of 2015, the Eighth Circuit still recognized a *de minimis*

15   intrusion into a person's liberty was permissible.  And in this

16   case, the testimony was that following Mr. Craig's encounter

17   with Mr. Leon, it took about another seven, eight minutes

18   before that dog got there.  That was the amount of time it took

19   for Officer Craig to do his initial search, realize he needed

20   more help, and then the four or five minutes it took for that

21   dog to get on scene.  It was less than ten minutes.  Our

22   briefings show that courts have routinely back -- the law in

23   March 2015, a stop of less than ten minutes to get the drug dog

24   there was a *de minimis* intrusion that did not have to be

25   supported by reasonable cause or reasonable suspicion, excuse

1   me.

2       So this never even turned into a *Terry* stop.  This was

3   consensual throughout, and the brief detention to get the drug

4   dog there was permissible.  We don't even need to look at those

5   parts because the overarching aspect of this case is it was

6   completely consensual based on his own words.  Officer Craig

7   asked for consent to search the vehicle within a couple of

8   minutes of being there.  He was still trying to ascertain the

9   reason that Mr. Leon was on the side of the road, he was

10  suspicious because of the nervousness, but even if that did not

11  rise to reasonable suspicion, he asked for consent and Mr. Leon

12  gave voluntary consent.  Everything that flowed from that point

13  forward was permissible.  Mr. Leon understands English.  He

14  gave an interview of more than an hour in English.

15      We had two experienced law enforcement officers, one

16  who's been a DEA agent for 17 years, another who was in law

17  enforcement as a trooper for 34 years that have talked to

18  thousands of suspects.  Both of them testified consistently

19  that Mr. Leon was responsive to their questions, initiated his

20  own conversation with them, gave concrete, definitive answers

21  and, importantly, never said he didn't understand anything.

22  The Court here saw he understood my questions to him.  So that

23  consent, Your Honor, was voluntary and it was knowing and he

24  did it twice.  Twice he told Officer Craig, You can search my

25  vehicle.  So even without reasonable suspicion, even under

1    *Rodriguez*, it was not a *de minimis* intrusion, he gave voluntary

2    consent.

3           And finally, Your Honor, and again, this is not what

4    we're hanging our hat on, so to speak, but if this court were

5    to find that a Fourth Amendment violation occurred and a

6    detention, that voluntary consent can make that search valid.

7    And that's under *U.S. v. Brown*, and that case outlined three

8    factors.  It was a Supreme Court case that outlined three

9    factors of how this taint can be cured.  And I would submit in

10   this particular case, the timing of this encounter, the

11   unequivocal consent, and the fact that if he was detained

12   improperly, it was for a matter of moments.  That coupled,

13   that's the fourth reason why this was a lawful search.  So,

14   Your Honor, last you asked if there was any supplemental,

15   anything to add to the record.

16          Our briefing schedule is a bit abbreviated because the

17   trial date that has since been moved, but we had to kind of

18   condense this to get this hearing in.  I would submit to the

19   Court *U.S. v. White*, which is 81 F.3d 775, that explains some

20   of the factors that courts look at to determine whether or not

21   a consensual stop turns into a *Terry* stop.  And in this case,

22   the factors that Officer Craig discussed, there was no weapons,

23   calm demeanor, never threatening, the only other officer that

24   was there was a passive observer.  All these factors were

25   present in *White* as well.  Officer Craig explained that he was

1   not under arrest and Mr. Leon just testified, he didn't get

2   placed into handcuffs until, in his words, 4:30, a long time

3   after the dog ran around the car.

4        Mr. Leon was not detained, he was not under arrest, it

5   was a consensual encounter, and he gave voluntary consent.

6   Your Honor, there was reasonable suspicion based on his

7   demeanor.  However, absent that reasonable suspicion, this is a

8   consensual encounter that led to voluntary consent and we

9   submit that none of this evidence should be suppressed.

10        MR. KAISER:  Your Honor, what began as a consensual

11  encounter quickly ripened into a seizure under the Fourth

12  Amendment.  Mr. Craig testified that he completed all tasks

13  associated with not the traffic stop, but with the encounter in

14  this case.  He didn't even check the insurance or other

15  paperwork of my client.  At the point when Craig ordered him

16  out of his own truck to look in the passenger compartment, a

17  reasonable person would not have felt free to leave the scene.

18  Mr. Leon testified he did not feel free to leave the scene

19  because an officer had told him to stand here and wait.  There

20  also was the threatening presence of several officers.  I

21  believe Trooper Melder testified there were at least four

22  officers on the scene including himself.  That is one of the

23  factors that points to a seizure.  We mentioned *Mendenhall* in

24  our brief.  Here law enforcement lacked reasonable suspicion

25  completely.

1    The government's sole basis for this reasonable suspicion

2  is my client's alleged nervousness and his apparent

3  overreaction with his hands, but as we heard from other law

4  enforcement, it is not uncommon for him to speak with his

5  hands, he's an emphatic person, just like I am doing right now,

6  talks with his hands.  Furthermore, that overreaction argument

7  simply falls into nervousness.  The sole basis is nervousness

8  and case law makes clear that that alone is not enough to

9  support reasonable suspicion of drug crimes.  This was not a *de*

10 *minimis* intrusion in this case.  The government has not met its

11 burden to show precise times showing that this intrusion was

12 really *de minimis*.  The government encourages this court to

13 ignore some of the police reports in the record, specifically

14 the arrest disposition report which clearly lists the arrest

15 time as 1530, or 3:30 p.m.

16    Even if we were to assume that that was the point of

17 initial contact, then there was at least 39 minutes that

18 elapsed between the initial point of contact and when the

19 Pavatt, I believe, the K-9 was deployed at 4:09 p.m., according

20 to the time stamp on the video.  This is not a ten minutes or

21 under intrusion, this is not *de minimis*.  Furthermore, the

22 scope of Mr. Leon's consent, should this court find that

23 consent was valid, was breached.  He had already opened the

24 back door to his truck, he had allowed the trooper to inspect

25 his cargo, everything had checked out.  At that point, a

1   reasonable person would have believed that the scope of their

2   consent had been reached, that the end of the line had been

3   reached.  At that point, the officer went far beyond the scope

4   of his consent which a reasonable person would have understood

5   to not include a dog sniff.  There was no mention of a dog

6   sniff up until the point that a dog was on the scene.

7        A few other points, Your Honor.  I believe the government

8   also points to logbook discrepancies, but then can't explain

9   what those discrepancies are.  Apparently delaying two days to

10  set off with one's cargo, according to the government, is

11  enough to confer reasonable suspicion of a drug crime.  It's

12  our position that nervousness plus alleged logbook

13  discrepancies does not add up in the totality of circumstances

14  to reasonable suspicion.  Aside from that, Your Honor, we stand

15  on our arguments in our motion and we respectfully request this

16  court to suppress the introduction into evidence of all alleged

17  contraband in this case.  Thank you, sir.

18           MR. GIVENS:  Can I reserve two minutes, Your Honor?

19           THE COURT:  Little late to be asking now, but sure.

20  I'm kidding, go ahead.

21           MR. GIVENS:  Your Honor, just Mr. Kaiser points out

22  that once Mr. Leon stepped out of the car and was directed by

23  Officer Craig to a location, and while the facts of how that

24  happened may be in dispute, what isn't in dispute is that prior

25  to that occurring, Mr. Leon gave his consent.  The reason that

1   he stepped out of the car was because he had given consent and

2   Mr. Craig was going to then search the vehicle.  So it's

3   irrelevant about whether he was or was not detained at that

4   point if this court finds involuntary consent was given.

5   Everything that happened from the point of voluntary consent

6   forward was permissible because the voluntary consent made

7   everything a consensual encounter.

8        Regarding, Your Honor, the 3:30 arrest, Mr. Leon's own

9   words stated he was arrested at 4:30.  The ADR that Officer

10  Craig said was not his, was not prepared by him, did say 3:30.

11  Mr. Leon's own words were that that's not when he was arrested,

12  that's not when the encounter occurred, that's not when the

13  timeline that we need to focus on occurred.  And last, Your

14  Honor, regarding the scope, it was obvious that the nature of

15  the search was for illegal narcotics, and *Florida v. Jimeno*

16  explains that the scope of consent is defined by what the

17  reasonable person believes the object of the questioning is

18  about.

19       In this case, Officer Craig was asking him specifically

20  about multiple drugs.  There can be no doubt that that's what

21  the search is for.  This search was not to determine if there

22  was furniture in the back of the truck as Mr. Leon said it was.

23  It was to determine if there were drugs.  No reasonable person

24  would believe that opening the back of the truck and seeing a

25  pack of furniture would end the search.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1      THE COURT:  Gentlemen, in light of the fact that

2  this case has been bumped till May 1st, I'm going to take the

3  matter under advisement.  I will likely give you a short form

4  answer with a more detailed order to follow soon.  So y'all

5  won't have to wait for the order to get your answer, you'll

6  just have to wait for the order to get a full explanation.

7  Thank you, gentlemen.  Appreciate it.

8      (Proceedings adjourned at 4:16 PM.)

9                     C E R T I F I C A T E

10     I, Karen Baker, Official Court Reporter, do hereby certify

11  that the foregoing is a true and correct transcript of

12  proceedings in the above-entitled case.

13

14

15  /s/ Karen Baker, RMR, CRR, CCR

    --------------------------------           Date: February 8, 2017

16  United States Court Reporter

17

18

19

20

21

22

23

24

25